[No. S004763. Crim. No. 26387. Dec. 31, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD ALLEN BENSON, Defendant and Appellant.

764

COUNSEL

Harvey Zall and Fern M. Laetham, State Public Defenders, under appointment by the Supreme Court, Larry Pizarro, Michael Tanaka and Kendall Goh, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney

General, John R. Gorey and Robert D. Breton, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—This is an automatic appeal (Pen. Code, § 1239, subd. (b)) from a judgment of death under the 1978 death penalty law (*id.*, § 190 et seq.).

On April 1, 1986, the District Attorney of San Luis Obispo County filed an information against defendant Richard Allen Benson. As subsequently amended, the information contained the following charges and allegations.

*Offenses and accompanying weapon-use allegations.*

(1) On January 5, 1986, defendant committed a lewd or lascivious act with Stephanie Camargo, a child under the age of 14. (Pen. Code, § 288, subd. (a).) (2) On the same date, he committed another such act with Stephanie. (*Ibid.*) (3) On January 6 he committed yet another such act with Stephanie. (*Ibid.*) (4) On January 5 he committed a lewd or lascivious act with Shawna Camargo, a child under the age of 14. (*Ibid.*) (5) On the same date, he committed another such act with Shawna. (*Ibid.*) (6) On January 6 he committed yet another such act with Shawna. (*Ibid.*) (7) On January 5 he murdered Laura Camargo (*id.*, § 187); he used a deadly and dangerous weapon (*id.*, § 12022, subd. (b)). (8) On the same date, he murdered Sterling Gonzales. (*Id.*, § 187.) (9) On January 6 he murdered Stephanie (*ibid.*); he used a deadly and dangerous weapon (*id.*, § 12022, subd. (b)). (10) On the same date, he murdered Shawna (*id.*, § 187); he used a deadly and dangerous weapon (*id.*, § 12022, subd. (b)). (11) On the same date, he committed arson of an inhabited structure. (*Id.*, § 451, subd. (b).) (12) On January 7 he kidnapped Karen Stange (*id.*, § 207, subd. (a)); he used a deadly and dangerous weapon (*id.*, § 12022, subd. (b)).

*Special circumstance allegations.* (1) Defendant committed multiple murder. (Pen. Code, § 190.2, subd. (a)(3).) (2) He intentionally killed a witness to a crime, viz., Stephanie Camargo. (*Id.*, § 190.2, subd. (a)(10).) (3) He intentionally killed a witness to a crime, viz., Shawna Camargo. (*Ibid.*) (4) He committed felony murder based on a lewd or lascivious act with Stephanie. (*Id.*, § 190.2, subd. (a)(17)(v).) (5) He committed felony murder based on a lewd or lascivious act with Shawna. (*Ibid.*)

*"Prior offense" allegations.* (1) Previously, defendant had been convicted of, and had served a prison term for, two violent felonies (Pen. Code, §§

667, subd. (b), 667.5, subd. (c)(6), 1203.066, subd. (a)(5)) involving a lewd or lascivious act with a child under the age of 14. (2) Prior to the commission of the offenses charged, he had been convicted, on charges brought and tried separately, of a serious felony (*id.*, § 667, subd. (a)), viz., kidnapping (*id.*, § 207). (3) Prior to the commission of the offenses charged, he had been convicted, on charges brought and tried separately, of two other serious felonies (*id.*, § 667, subd. (a)), viz., kidnapping (*id.*, § 207) and residential burglary (*id.*, § 459).

Defendant pleaded not guilty to the charges and denied the allegations. On his motion, the court changed venue from San Luis Obispo County to Santa Barbara County.

Trial was by jury. Before opening statements, the parties stipulated to the severance of count 12, which charged the kidnapping of Karen Stange. During the People's case-in-chief, defendant withdrew his denial as to the "prior offense" allegations and admitted their truth. The jury returned verdicts finding defendant guilty as charged on the remaining counts, determined each of the murders to be of the first degree, and found all the weapon-use and special circumstance allegations true. The jury subsequently returned a verdict of death for the murders. On the People's motion, the court dismissed count 12. It then entered judgment accordingly.

As we shall explain, we conclude that except as to the witness-killing special circumstances, the judgment must be affirmed.

## I. FACTS

### A. *Guilt Phase*

The evidence introduced at the guilt phase—which included parts of two confessions defendant made to the police and one he made to a police psychiatrist—establishes the following core of facts.

On the evening of Saturday, January 4, 1986, Laura Camargo set out to visit Barbara Lopez and Katrina Flores. The three women were close friends. Laura lived in Nipomo with her children, Stephanie Camargo, age four, Shawna Camargo, age three, and Sterling Gonzales, age twenty-three months, in a small, two-room shack that shared an unattached bathroom with another unit. Barbara and Katrina lived with their children in an apartment in Oceano, which was about 10 miles away. Just before Thanksgiving of 1985, defendant had moved into the apartment; he was a jeweler by trade. Over the following weeks, he became acquainted with Laura and her children.

On the evening in question, Laura secured a baby-sitter to care for Stephanie, Shawna, and Sterling, and then obtained a ride to Oceano. She socialized with Barbara, Katrina, and defendant. Before long, she decided to return home. Defendant arranged for a ride. Taking measures to conceal his destination from Barbara and Katrina, he accompanied Laura to Nipomo, carrying with him a heavy briefcase. As he later admitted, he "went out there with the intention of doing something to the kids."

Around midnight, defendant and Laura arrived at the shack, and the baby-sitter departed. Shortly thereafter, defendant took up a claw hammer he found in the shack, apparently positioned himself behind Laura, and repeatedly and violently struck her in the head, as he subsequently acknowledged, "to take her out." Laura fell; defendant thought she was dead; she gurgled loudly; he stuffed socks into and over her mouth; she soon expired. From that point on, he took pains to make it appear to Laura's neighbors that no one was in the shack. He proceeded to sexually assault Stephanie and Shawna.

Throughout Sunday, January 5, defendant continued to molest the two girls. A number of times that day, neighbors came by the shack and the common unattached bathroom. More than once, Sterling coughed and cried; more than once, defendant quieted the child. After nightfall defendant—in words he later used—"realized . . . that it was inevitable": in order to avoid discovery, he decided to kill Sterling. Although he met with resistance from the child as he attempted to smother and strangle him to death, he finally succeeded. With Laura and Sterling dead, he found himself in what he later described as "a molester's type of heaven": in the paraphrase of the police psychiatrist to whom he confessed, "it was like being in heaven, and being completely able to get what he wanted with no interference."

As Monday, January 6, approached, defendant continued to molest Stephanie and Shawna. At the same time, he began to consider whether he should kill the girls. As he later described his thoughts: "I knew it couldn't be put off and uh, in the state of mind that I was in at that time, the best thing, no I can't say it like that, the only option I had was to go ahead and finish the job and uh, try to keep from being implicated in it, okay. Uh, I had trouble bringing myself to do it . . . . [A]nd uh, you know, three, four times I set them up for it and I, I just couldn't do it . . . ." As the sky began to lighten, however, defendant found himself able to carry through. He took up a heavy steel jeweler's mandrel which he carried in his briefcase; he repeatedly struck Stephanie and Shawna in the head; seeing that death did not come immediately, he seized the claw hammer and used the instrument to dispatch the children. As he subsequently admitted, he killed Stephanie and Shawna, and Laura and Sterling before them, "to protect my

freedom." To cover his crimes, he proceeded to start a fire in the shack. About 8 a.m., just before the flames began to rage, he fled.

## B. *Penalty Phase*

The People presented a case in aggravation. They set out to establish the circumstances of the crimes and the character of the criminal. To that end, they introduced, virtually in their entirety, defendant's two confessions to the police. The statements provided many details about the incidents in question. For example, to start the fire defendant used materials he carried in his briefcase: the items included pornographic magazines; they also included pages of an album with sexually suggestive photographs of men and women—with the faces of girls pasted over the faces of the women. The statements contained several expressions of remorse. But they also contained what appear to have been lies to minimize culpability. For instance, defendant portrayed himself as "Uncle Richard": he claimed that Laura "sold" Stephanie and Shawna to him in exchange for his promise to pay her $150, and had indeed pressured him into agreeing to the bargain; she initiated, and participated in, the sexual activity; he was gentle and caused no hurt; the children enjoyed the "play" and indeed took an active and enthusiastic role.

The People also sought to prove that on Tuesday, January 7, 1986, the day after he fled from Laura's shack, defendant kidnapped Karen Stange (Pen. Code, § 207, subd. (a)), through the use or threat of force or violence. Stange testified to the incident. She stated, inter alia, that on the afternoon of January 7, she and defendant met at the home of a mutual friend in Oceano; he asked her for a ride to Los Osos, she refused but offered to take him as far as San Luis Obispo, and he accepted; after they arrived at San Luis Obispo, he put a knife to her throat and displayed a needle whose prick he said would be fatal, and ordered her to drive to Los Osos; on the way, they stopped at a liquor store, and he instructed her to purchase pornographic magazines that "showed [a] progression from childhood to adult[hood]"; after they reached Los Osos, she managed to escape.

Finally, the People set out to prove that defendant had suffered certain prior felony convictions, and to establish that his conduct underlying such convictions involved the use or threat of force or violence. They offered stipulations as to the convictions, and the testimony of witnesses, including the victims, as to the underlying conduct. The tale told is as follows.

In March 1972 defendant was convicted of committing a lewd or lascivious act with Joanna M., a child under the age of 14. (Pen. Code, § 288.) At

the time of the offense, Joanna was nine years old. Defendant made a forcible sexual attack on the child.

In January 1976 defendant was convicted of kidnapping Lisa W. (Pen. Code, § 207.) At the time of the offense, Lisa was eight or nine years old. Defendant forcibly assaulted the child.

Also in January 1976, defendant was convicted of committing a lewd or lascivious act with Leslie H., a child under the age of 14. (Pen. Code, § 288.) At the time of the offense, Leslie was three years old. Defendant was acquainted with Leslie and her family. He made a forcible sexual attack on the child.

In December 1980 defendant was convicted of kidnapping Sara M. (Pen. Code, § 207) and of committing residential burglary (*id.*, § 459)—specifically, entering Sara's home in the nighttime with the intent to commit the kidnapping. At the time of the offenses, Sara was four years old. Defendant was acquainted with Sara and her family. He threatened the child with a forcible sexual attack.

Defendant presented a case in mitigation. He introduced evidence relating to his background and character. The information came from expert witnesses as well as lay, including defendant's family, friends, neighbors, teachers, and others.

Defendant was born on April 18, 1947, the fourth child in a family of six boys and one girl. His father was an alcoholic; his mother also was an alcoholic, as well as a drug addict and prostitute. At the hands of his parents and a stepmother, he suffered neglect and abuse. Early on, he began to have run-ins with the law, abuse alcohol and drugs, and engage in pedophilia. From childhood into adulthood, he lived mainly in institutions of various sorts: foster homes, group homes, juvenile hall, the California Youth Authority, jail, and prison. Defendant's sister and two of his brothers testified on his behalf.

Experts offered opinion to the effect that defendant was a drug-dependent pedophile with an antisocial personality disorder, and that he may have been experiencing mental or emotional disturbance or diminished capacity at the time of the offenses in question as a result of his pedophilia and the ingestion of drugs. On direct examination, defendant elicited testimony suggesting he would not be dangerous in prison. On cross-examination, the People elicited testimony suggesting the opposite.

In addition to evidence relating to his background and character, defendant also introduced evidence concerning the nature of capital punishment.

Specifically, he played a videotape of a brief segment of a television series called "Two on the Town," which dealt with San Quentin Prison and the infliction of the penalty of death.

In rebuttal, the People called one Mike Madding. Madding was the Public Information Officer at San Quentin Prison at the time the "San Quentin" segment was produced, and was interviewed on camera during the piece. He testified as to the nature of the penalty of life imprisonment without possibility of parole.

## II. GUILT ISSUES

Defendant raises two claims bearing on the question of guilt. As will appear, neither is meritorious.

### A. Denial of Motion to Suppress Confessions to Police

After the jury was sworn and before the People made their opening statement, defendant moved to suppress his two confessions to the police. He had given those statements during interviews conducted on January 9 and 13, 1986, by officers including Detective Steven A. Bolts of the San Luis Obispo Sheriff's Department and Investigator Larry Wayne Hobson of the San Luis Obispo District Attorney's Office. As relevant here, the ground of the motion was that the confessions were involuntary under the due process clauses of the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15, of the California Constitution (hereafter sometimes article I, sections 7 and 15). ■■■ The argument in support was that the statements were assertedly obtained by what was claimed to be a promise of benefit, viz., a comment by Detective Bolts, "There's no death penalty here."

Imposing on the People the burden of proving that defendant's confessions were voluntary beyond a reasonable doubt in conformity with the decision in *People v. Jimenez* (1978) 21 Cal.3d 595, 602-609 [147 Cal.Rptr. 172, 580 P.2d 672],[1] the court held a hearing on the motion outside the presence of the jury. The People presented evidence of the interviews: they introduced fourteen 60-minute audiotape cassette recordings as well as a 227-page transcript of their contents; they also called Detective Bolts to the witness stand. Defendant too presented evidence of the interviews: he

[1] Of course, since the crimes herein were committed after June 9, 1982, the effective date of article I, section 28, subdivision (d), of the California Constitution (*People v. Smith* (1983) 34 Cal.3d 251, 257-263 [193 Cal.Rptr. 692, 667 P.2d 149]), the People were required to prove voluntariness only by a preponderance of the evidence. (*People v. Markham* (1989) 49 Cal.3d 63, 71 [260 Cal.Rptr. 273, 775 P.2d 1042].)

himself took the stand. After presenting argument, the parties submitted the matter.

The next day, the court made its ruling. Determining, in substance, that there was no coercive police activity and that Detective Bolt's comment did not constitute a promise of benefit and in any event did not operate as an inducement, it concluded that the confessions were voluntary beyond a reasonable doubt.[2] It accordingly denied the motion to suppress the statements and, as noted, subsequently admitted portions at the guilt phase and virtually all at the penalty phase. As relevant here, its findings in support of the ruling were as follows.

"Now, let me just touch briefly on the factual setting that the Court is dealing with. [Defendant was advised of, and waived, his rights under *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], prior to each of the interviews.] By way of background, I think it is appropriate to note for the record that in my opinion we are dealing with Mr. Benson a defendant who is very articulate, very well-spoken, seems to the Court having read this transcript, that he's an intelligent young man.

"Secondly, by Mr. Benson's own account, he was experienced in the criminal justice system. . . .

"It was also brought to the Court's attention yesterday that Mr. Benson was aware that he was a suspect in this, in the Nipomo homicide[s] very early on . . . . So he knew that going into the interview setting that we are focusing on.

"Now, let's talk about the interview itself. If I understand correctly, there were some one and a half to two hours of interview between Mr. Benson, Detective Bolts, and Detective Hobson in which there were no recordings made. And then the tape recorder was started, activated. And there was another time frame, I guess, of an hour or perhaps even more on that tape before the sequence came up that we are focusing on. Sequence being this, quote, 'There's no death penalty here,' close quote.

"The record should reflect that at least on the portion of the record, the transcript that I have of the discussion between Mr. Benson and the police officers up to that point of the statement by Detective Bolts, there was—oh, I guess for want of a better word—there was a lack of candor in Mr.

---

[2] Because of article I, section 28, subdivision (d), of the California Constitution (see fn. 1, *ante*), the court was required to make its determination of voluntariness only by a preponderance of the evidence. (See *People* v. *Markham*, *supra*, 49 Cal.3d at p. 71.)

Benson's responses and some evasiveness to the detectives—responses to the detectives' questions about the kidnapping.

"And then the questioning shifts from the kidnapping area to the investigation of the Nipomo murders . . . .

". . . . . . . . . . . . . . . . . . .

"Yes. The focus of the questions now has shifted, and the detectives by way of their questions to Mr. Benson have pointed out perhaps the obvious; that is, that his responses are not coinciding with responses made by other people who have given statements already . . . .

". . . . . . . . . . . . . . . . . .

"Then there is this colloquy between the detectives and Mr. Benson about, 'Your friends, and they are kind of sucked into this situation now. And what's going to happen to them, they're stuck in the middle here.'

"Mr. Benson says, quote, 'Yeah, they don't deserve it.' Close quote.

"There is a statement by Detective Bolts where he's talking about things are different than they were in State Prison where people might lie for you.

"Then Detective Hobson says this, 'Richard, tell us what happened. We want to hear your side of the story.'

"And Mr. Benson says, 'I don't know, man. It's horrible, and I don't even think I'm capable to do something like that.' Close quote.

"Okay. Now, to me, having heard these tapes of this portion of the interview and having reread my transcript, to me, it seems fairly clear that Mr. Benson was focusing on the horror of the situation. I think he said yesterday, and I think it shows up later in the transcript here that he had feelings of real, real strong mental feelings here of why this all happened. And I see—I think reviewing this, that those were motivating his thinking, those feelings of horror and shame and guilt, motivating his thinking at this time.

"Okay. Now, we go on and there's some further questioning, and then Detective Hobson says, 'What's going through your head right now, Richard?'

"Mr. Benson says, 'I don't think you'd believe it.'

" 'DETECTIVE HOBSON: I'd like to believe it. Try me. We sat here with you all this time. That's why we're still here with you, because we care also.

" 'DETECTIVE BOLTS: We're caring, feeling human beings. We have compassion for a lot of things. We've seen a lot worse, believe me. This is not the end of the line by any means.

" 'DETECTIVE HOBSON: Richard, if we didn't care, we wouldn't be sitting here.

" 'MR. BENSON: I don't see—I don't see how you can say it's not the end of the line.

" 'DETECTIVE BOLTS: It's not.

" 'MR. BENSON: It is for me.

" 'DETECTIVE BOLTS: Why? There is no death penalty here.'

"Okay.

"Now, immediately thereafter, immediately after Detective Bolts says, 'Why? There's no death penalty here,' Mr. Benson's comment is, 'That doesn't matter.'

"And then Detective Hobson right away says, 'Wait a minute. Before we talk about that—'and another version of the transcript said, 'Before we talk about death penalty, we don't know what happened in that house.'

"Okay. Now, those are three important statements. Detective Bolts, 'Why? There's no death penalty here.'

"Mr. Benson, 'That doesn't matter.'

"Detective Hobson, 'Wait a minute. If—before we talk about that, we don't know what happened in that house.' Okay.

"Now, what happens then, did Mr. Benson immediately rely upon the statement of Detective Bolts? Did he totally discount what Detective Hobson said thereafter? 'Wait a minute. Before we talk about that,' or, 'Before we talk about death penalty, we don't know what happened in that house.' Did he discount that and open up immediately and start sharing his—[baring] his [soul] about this?

"No way. Go on for a little bit. He says,

" 'DETECTIVE HOBSON: Laura had a temper, we know that. Maybe you were put into a position where you had to make a choice.

" 'MR. BENSON: It doesn't matter what choices I had.

" 'DETECTIVE HOBSON: Sure, it does.

" 'MR. BENSON: No, because nothing justifies the outcome.'

"Okay. This is tied in exactly with what we were talking about before that statement was even made.

" 'What's in your mind?'

" 'RICHARD: I don't think you'd even believe it. I don't know, man. It's horrible. I don't even think I'm capable of doing something like that.' That's in his mind now. He's thinking about the horror of it, and he says to the officer, 'It doesn't matter what choices I had because nothing justifies the outcome.' Okay.

"Then Detective Hobson says, 'Well, why don't you tell us and let us decide that.'

"And Mr. Benson says, 'The thing of it is I can't.'

"Detective Benson—or Detective Hobson, 'Why?'

"Mr. Benson, 'I don't know.'

"Detective Hobson, 'You don't know what?'

"Mr. Benson, 'I don't know what happened.'[3]

[3] The colloquy quoted by the court appears as follows in the transcript introduced into evidence.
"Hobson: What's going through your head right now Richard?
"Benson: I don't think you'd believe it.
"Hobson: I'd like to believe it, try me. We sat here with you all this time and that's why we're still here with you, because we care also.
"Bolts: We're caring, feeling, human beings and we have compassion for a lot of things and we've seen a lot worse, believe me, this is not the end of the line by any means.
"Hobson: Richard, if we didn't care, we wouldn't be sitting here.
"Benson: I don't see, I don't see how you can say it's not the end of the line.
"Bolts: It's not.
"Benson: It is for me.

"Okay. So then we go into several minutes of, again, less than candid responses. And then finally and slowly in the interview, they get around to the point where some candor is shown and those statements are made.

"Okay. Then—trying to look at this entire scenario here—then later on, perhaps as long as two hours later, Detective Hobson and Detective Bolts leave the room and a lieutenant that I cannot remember his name comes into the room with Mr. Benson and visits for a period of time. And Mr. Benson says something to [the] lieutenant of a nature that these two detectives, Hobson and Bolts, have done a very good job. And there are laudatory comments about they should be complimented for the good job that they've done in this interview session.

"Okay. Then a couple of days later in a subsequent interview, and this goes back to what I said early on about Mr. Benson's knowledge of the system, and why he was there in that room, and what it was all about. This is a subsequent interview, and Detective Bolts and Detective Hobson are explaining to Mr. Benson what might happen now when he goes to court. They're talking about the arraignment process, 'And you'll enter your plea and you'll be given an opportunity.'

"And Detective Bolts says . . . [.]

" 'Not necessarily. You might not even be asked for a plea. They'll decide the counsel issue first. So that you've had time to discuss your plea or the situation with counsel and enter a plea. It's not uncommon for them to continue an arraignment for days or weeks in order for you to carefully consider your legal options. You know that—you know that all too well.

"Bolts: Why? There's no death penalty here.
"Benson: That doesn't matter.
"Hobson: Wait a minute, before we talk about that, we don't know what happened in that house . . . [.]
"Bolts: Exactly. We know what kind of a person Laura could be.
"Hobson: Laura had a temper. We know that. Maybe you were put into a position where you had to make a choice.
"Benson: It doesn't matter what choices I had.
"Hobson: Sure it does.
"Benson: No, because nothing justifies the outcome.
"Hobson: Well, why don't you tell us and let us decide that.
"Benson: The thing ot [sic] it is, I can't.
"Hobson: Why?
"Benson: I don't know.
"Hobson: You don't know what?
"Benson: I don't know what happened."

"'MR. BENSON: I have enough knowledge of the legal system and the information that I have given you that nothing is going to change the fact that I did it and I admitted it. Now, this is going to be the end result. I did do it, and I did admit it. I don't understand how, I mean, I'm sure they can, now that you mention it, but I don't understand how they can ask me in a court of law how I plead and not accept my . . . [.]'

"And then it goes on there, and then I think the next to last page of the transcript there is this colloquy.

"'DETECTIVE BOLTS: Okay.

"'We'll make sure that you get commissary, any other items that you need besides cigarettes?'

"Detective Bolts continues,

"'For a few hours today, we'll probably be talking to you again if you so desire. Just so that I'm clear, is there something that we've said, as far as you know, threats that we have made to you, or promises, or any promises of leniency, anything that has caused you to tell us what you've told us?

"'MR. BENSON: No. I'm surprised that that came up.

"'DETECTIVE BOLTS: Well, I—you know, it's something that, you know, I've thought of that maybe something we said that you interpreted as some kind of threat or promise or some—

"'MR. BENSON: You know what, if you guys started whipping me with billy clubs right now, you'd see me smile. So you know that's not a—a—now, no. You guys are good at your job. I complimented you to your lieutenant about it, as a matter of fact. I'm glad you are, because it served in getting me off the street, you know. I feel that in some sick, twisted way I helped a little bit, but you guys still—you did your job.'

"Now, I mean, when I was thinking about this, I was asked to focus my attention on those six words: 'Why? There is—Why? There's no death penalty here.' And I did some rough calculation on this transcript of the final hours of the interrogation, and there were in the area of 152,000, 153,000 words in this transcript.

"And I guess the suggestion is—I mean, I don't—I'm not sounding critical. I don't mean it to sound that way, but I guess when I was focusing on those six words: 'Why? There's no death penalty here.' The argument

would have—would go that I should discount and not consider the other 152,600 [*sic*] words. And I think the case law suggests that that is inappropriate.

"I think the case law points out that it is necessary for me to consider the entire gamut of questions, the attitude of the participants, the factual setting. I ask myself some questions, some obvious questions: What is the nature of the benefit allegedly offered to Mr. Benson by this, 'Well, there's no death penalty? Why? There's no death penalty here,' statement. That, 'This is not the end of the line by any means. There's no death penalty here.' And then again the response, 'Well, it doesn't matter, nothing justifies the outcome.'

". . . . . . . . . . . . . . . . . . . . . . .

". . . [T]here is no suggestion that would be any worse or different if Mr. Benson confessed or if he didn't confess . . . .

". . . . . . . . . . . . . . . . . . . . . . .

" . . . Everything totally aboveboard with the officers. No coercion, no harassment. No heavy-handedness, at least in the hundreds of pages that I've read. To the contrary, it was strangely cordial and somewhat light, and not at all heavy-handed in the approach that was taken. There was open discussion in our—in the interview that I'm dealing with.

"The obvious question, did Mr. Benson rely on—was he induced by Detective Bolts' statement? I asked the obvious question, was there anything to rely on? . . .

". . . [T]here's no suggestion of different treatment if Mr. Benson chose to make any confessions or admissions . . . .

". . . . . . . . . . . . . . . . . . . . . . .

". . . We don't have any tough guy cop approach. As I've commented, we had to the contrary, officers who were patient and even-handed and fair in the way they approached their—this discussion.

". . . . . . . . . . . . . . . . . . . . . . .

". . . [T]here was no breaking down or loss of composure. Listening to the tape, it was clear that he was thinking clearly and appropriately. It was

clear to the Court in listening to it that, in fact, he hedged on the truth, understandably, for much of the interview until things started unraveling.

"Okay. When I compare . . . 'The totality of the circumstances in viewing the interview in its entirety in light of all of the attendant circumstances,' I'm persuaded beyond a reasonable doubt that Mr. Benson's statements were not coerced by promise of leniency, but rather were made freely and voluntarily."

Defendant now contends that the court erred by denying his motion to suppress his confessions to the police as involuntary.

■ An involuntary confession, of course, is inadmissible under the due process clauses of both the Fourteenth Amendment (e.g., *Jackson* v. *Denno* (1964) 378 U.S. 368, 385-386 [12 L.Ed.2d 908, 920-921, 84 S.Ct. 1774, 1 A.L.R.3d 1205]) and article I, sections 7 and 15 (e.g., *People* v. *Ditson* (1962) 57 Cal.2d 415, 438-439 [20 Cal.Rptr. 165, 369 P.2d 714] [decided under the predecessor of Cal. Const., art. I, § 15]). (See, e.g., *People* v. *Boyde* (1988) 46 Cal.3d 212, 238 [250 Cal.Rptr. 83, 758 P.2d 25], affd. *sub nom. Boyde* v. *California* (1990) 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190].)

A confession is involuntary under the federal (e.g., *Malloy* v. *Hogan* (1964) 378 U.S. 1, 7 [12 L.Ed.2d 653, 658-659, 84 S.Ct. 1489]) and state (e.g., *People* v. *Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418]) guaranties of due process when it "was ' "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence[]" ' " (*Hutto* v. *Ross* (1976) 429 U.S. 28, 30 [50 L.Ed.2d 194, 197, 97 S.Ct. 202] (*per curiam*)). (See *People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97].) "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' . . . ." (*Colorado* v. *Connelly* (1986) 479 U.S. 157, 167 [93 L.Ed.2d 473, 484, 107 S.Ct. 515].) That is the law under the Fourteenth Amendment. (*Ibid.*) It is also the law under article I, sections 7 and 15. (*People* v. *Kelly* (1990) 51 Cal.3d 931, 973 [275 Cal.Rptr. 160, 800 P.2d 516] (conc. opn. of Mosk, J.).)

■ A confession is "obtained" by a promise within the proscription of both the federal and state due process guaranties if and only if inducement and statement are linked, as it were, by "proximate" causation. This is certainly true for the federal right. The requisite causal connection between promise and confession must be more than "but for": causation-in-fact is insufficient. (*Hutto* v. *Ross, supra,* 429 U.S. at p. 30 (*per curiam*).) "If the test was whether a statement would have been made but for the law enforce-

ment conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action." (*U.S.* v. *Leon Guerrero* (9th Cir. 1988) 847 F.2d 1363, 1366, fn. 1.) The foregoing is also true for the state right. (*People* v. *Kelly, supra,* 51 Cal.3d at p. 973 (conc. opn. of Mosk, J.).)

■ When a challenge is mounted, the prosecution must prove that a confession is voluntary by a preponderance of the evidence under the Constitutions of the United States (e.g., *Lego* v. *Twomey* (1972) 404 U.S. 477, 489 [30 L.Ed.2d 618, 627-628, 92 S.Ct. 619]) and California (*People* v. *Markham, supra,* 49 Cal.3d at p. 71).[4]

■ On appeal, the determination of a trial court as to the ultimate issue of the voluntariness of a confession is reviewed independently in light of the record in its entirety, including "all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation" (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041]). (E.g., *Davis* v. *North Carolina* (1966) 384 U.S. 737, 741-742 [16 L.Ed.2d 895, 898-899, 86 S.Ct. 1761] [reviewing federal constitutional claim]; *People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74] [apparently speaking of review of both federal and state constitutional claims].)

The trial court's determinations concerning whether coercive police activity was present, whether certain conduct constituted a promise and, if so, whether it operated as an inducement, are apparently subject to independent review as well. The underlying questions are mixed; such questions are generally scrutinized de novo; that is especially true when—as here—constitutional rights are implicated (*People* v. *Louis* (1986) 42 Cal.3d 969, 984-987 [232 Cal.Rptr. 110, 725 P.2d 180] [articulating principles underlying both federal and state standard-of-review jurisprudence]).

Lastly, the trial court's findings as to the circumstances surrounding the confession—including "the characteristics of the accused and the details of the interrogation" (*Schneckloth* v. *Bustamonte, supra,* 412 U.S. at p. 226 [36 L.Ed.2d at p.862])—are clearly subject to review for substantial evidence. The underlying questions are factual; such questions are examined under the deferential substantial-evidence standard (*People* v. *Louis, supra,* 42 Cal.3d at pp. 984-987 [articulating principles underlying both federal and state standard-of-review jurisprudence]).

■ Having considered the matter closely, we are of the opinion that the court did not err by denying defendant's motion to suppress his confessions to the police as involuntary.

---

[4] See footnote 1, *ante.*

After independently reviewing the record in its entirety, we believe that the court properly concluded that the confessions were voluntary beyond a reasonable doubt. Examined de novo, each of the court's crucial determinations is sound.

First, the police activity here was clearly not coercive. Having weighed the evidence, including the audiotapes and the transcript, we agree with the court's assessment: "Everything totally aboveboard with the officers. No coercion, no harassment. No heavy-handedness . . . . To the contrary, it was strangely cordial and somewhat light, and not at all heavy-handed in the approach that was taken." "We don't have any tough guy cop approach . . . . [W]e had to the contrary, officers who were patient and even-handed and fair in the way they approached their—this discussion." "[T]here was no breaking down or loss of composure."

Defendant finds fault with the interrogation in several particulars. His complaints, however, simply fail to establish coercion on the part of the officers. He claims, for example, that the interrogation was "calculated" to secure a confession. But "calculation" does not necessarily imply compulsion.

Second, Detective Bolts's comment about the death penalty did not constitute a promise of benefit.

What the appropriate standard is for determining whether certain conduct amounts to a "promise" is apparently an open question: is it purely "objective" (i.e., from the perspective of a reasonable person); purely "subjective" (i.e., in accordance with the suspect's actual understanding); or purely neither and partly both? (See generally *People* v. *Conte* (1984) 421 Mich. 704, 739-740 [365 N.W.2d 648] [choosing what is evidently a hybrid standard, viz., "whether the defendant is likely to have reasonably understood the statements in question to be promises of leniency"], and cases cited therein.) But as will appear, the question need not be resolved here.

The conclusion that Detective Bolts's comment did not constitute a promise follows if the remark is construed "objectively." Interpreted thus, it amounts to no more than an observation that ultimately proved to be incorrect—to the effect that the death penalty was not available here. Nothing in the surrounding circumstances transforms the comment's meaning or its force. Defendant claims in substance that Investigator Hobson's interjection, "Wait a minute, before we talk about that, we don't know what happened in that house," supported the "promise" he discerns in Bolts's words and conditioned that "promise" on his confession. We disagree. Hobson's words effectively "withdrew" the remark. And as defendant him-

self conceded at the hearing, the remark was not "renewed": the officers "[n]ever again discuss[ed] the matter of the death penalty with" him.

The conclusion that Detective Bolts's comment did not constitute a promise follows even if the remark is construed "subjectively." Several times at the hearing, defendant made admissions bearing on the matter.

At one point, he stated that his interpretation was as follows: "That at that time there was no—that the death penalty was dormant in California, and that they weren't seeking the death penalty as far as what the interview, what the case was going to."

At another point, he said: "I felt that they were confirming what I already believed, that they weren't seeking the death penalty, and the reason they weren't seeking it is because at that time it wasn't being used in California."

At yet another point, he stated: "You know, I can't honestly say that anyone straightforward came out and said, 'What—if you talk to us, I'm not going to give you the death penalty.' I interpreted it to mean that the death penalty was—I mean, an officer, I mean, you know, handling the investigation is telling me, 'There is no death penalty here.' I assumed to be it wasn't being sought, or that because of legal things in the court, the death penalty was either out, or going to continue being dormant."

It is true that defendant also testified that he did indeed interpret Detective Bolts's comment as a promise. But the court clearly, albeit impliedly, found his testimony unworthy of credit. On this record, we must agree.

Third, Detective Bolts's comment about the death penalty did not operate as an inducement. On this record, it is difficult to conclude that the remark was even a cause-in-fact of the confessions. To Bolts's observation, "There's no death penalty here," defendant immediately responded, "That doesn't matter." The evidence practically compels the inference that insofar as the confessions were concerned, the comment in fact "didn't matter." We recognize that the remark preceded defendant's confessions. The intervening period of time, however, was not insubstantial. Moreover, temporal priority does not establish causal force: it is a logical fallacy to reason *post hoc ergo propter hoc*. In any event, the evidence simply does not support an inference that the causal connection between Bolts's comment and defendant's confessions was more than "but for." As explained above, however, causation-in-fact is insufficient.

Again, it is true that defendant testified that he was indeed induced to confess by the comment. But again, the court clearly, albeit impliedly,

found his testimony lacking in credibility. Again, on this record we must agree.

In conclusion, we are of the opinion that defendant's confessions were voluntary beyond a reasonable doubt. The court effectively determined that defendant spoke not because of coercion applied by the police but as a result of compunction arising from his own conscience. After independent review, we agree. Accordingly, the court did not err by denying the suppression motion.[5]

## B. *Denial of Motion to Suppress Confession to Police Psychiatrist*

■ Defendant moved to suppress his confession to the police psychiatrist. He had given the statement during an interview conducted by the psychiatrist, William E. Gordon, a member of the Sexual Assault Response Team, on January 10, 1986—the day after his first confession to the police.

Defendant made the motion orally in the midst of Dr. Gordon's testimony as the People's first witness. The ground was evidently that the confession was involuntary under the due process clauses of the Fourteenth Amendment and article I, sections 7 and 15.[6] The argument in support was somewhat vague—to the effect that the statement was assertedly obtained by a promise of benefit and/or the improper influence of official deception. The "promise," it appears, was a statement by a jailer: late on the night of January 9, 1986, after giving his first confession to the police, defendant was placed on "suicide watch," and was put naked into a small, empty cell with foam-rubber padded walls and bare concrete floor—a so-called "rubber room"; he was told by the jailer that he would not be released until he was "cleared" by "Mental Health." The "deception," it appears, was the alleged substitution of Dr. Gordon in place of an expected visitor "from Mental Health" the next morning.

The court conducted a hearing outside the presence of the jury. The evidence included live testimony by defendant; the testimony he had given

---

[5] In support of his claim of error, defendant attempts to present other arguments attacking other aspects of the interrogation (e.g., "psychological coercion," "deception," and "threats"). But when, as here, a party did not raise an argument at trial, he may not do so on appeal. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1251-1252 [270 Cal.Rptr. 451, 792 P.2d 251].) In any event, the arguments presented are simply without merit.

[6] On appeal, defendant asserts that the motion rested on another ground as well, viz., that his confession to Dr. Gordon was "tainted" by his first, allegedly involuntary confession to the police. It was as an objection to the admission of this confession that defendant had raised the issue of "taint." That objection was impliedly overruled by the court, which reasoned—correctly—that the first confession was voluntary and, as such, could not carry any "taint."

at the hearing on the motion to suppress his confessions to the police; and, it appears, the transcript of those statements.

Concluding impliedly that the confession to Dr. Gordon was voluntary beyond a reasonable doubt, the court denied the motion. It determined, in substance, that defendant was properly advised of his *Miranda* rights by Dr. Gordon, and that he effectively waived those rights; that "there is no evidence . . . of any kind of physical, or mental, psychological coercion upon Mr. Benson to talk with Dr. Gordon"; that the authorities made no promise and practiced no deception; and that defendant freely gave his statement out of compunction. As noted, parts of the confession were subsequently introduced at the guilt phase.

Defendant now contends that the court erred by denying his motion to suppress his confession to Dr. Gordon. We disagree. Reviewed de novo, the court's conclusion of voluntariness and its supporting determinations are all sound.

First, defendant was properly advised of, and effectively waived, his *Miranda* rights—nor does he claim otherwise.

Second, and of crucial importance, the necessary element of coercion on the part of the authorities is lacking. The record supports, indeed compels, the court's conclusion: "there is no evidence . . . of any kind of physical, or mental, psychological coercion upon Mr. Benson to talk with Dr. Gordon."

Defendant claims that "The police secured the . . . confession [to Dr. Gordon] by manipulating [his] custody so that he believed that the only way to secure his release from the 'rubber room' was to talk to the police psychiatrist." "Manipulation," however, is simply absent from the record.

We recognize that defendant was placed in a "rubber room" on "suicide watch." But we cannot discern any official coercion therein. Indeed, at the hearing defendant effectively conceded that the placement was justified. In giving his first confession to the police, he made statements that he admitted "someone could have interpreted . . . as being suicidal."

We also recognize that defendant testified that he spoke with Dr. Gordon "[b]asically to get out of that cell." The court expressly found the assertion unworthy of credit. Its finding is supported by substantial evidence. But in any event, the assertion is insufficient: it does not establish official coercion.

Third, there was no promise or deception by the authorities. The evidence introduced at the hearing, including defendant's own testimony, does

not support the inference of any promise. Construed either "objectively" or "subjectively," the jailer's statement, i.e., that defendant would not be released until he was "cleared" by "Mental Health," was merely a statement. That same evidence does not support the inference of any deception. In fact, defendant himself admitted that prior to the interview, Dr. Gordon properly identified himself as a physician and a member of the Sexual Assault Response Team. His assertion that he nevertheless believed that Dr. Gordon "was from Mental Health" is of no consequence: his "belief" cannot properly be attributed to deceptive conduct on the part of the government.

Finally, defendant made his confession freely out of compunction. The court stated: "[I]t seems to me clearly that Mr. Benson was going through some terribly draining emotional feelings. And that in his own heart and mind he felt it was necessary to get this off of his chest and to speak to somebody about it." We share the court's view.

In sum, the denial of defendant's motion to suppress his confession to Dr. Gordon was not error.

### III. SPECIAL CIRCUMSTANCE ISSUES

■ Defendant attacks the validity of two of the five special circumstance findings, specifically, those involving the killing of a witness. As will be shown, the attack is successful.

Defendant contends that the evidence is insufficient to support the witness-killing special-circumstance findings. As noted, two such special circumstances were alleged and subsequently found true, one involving Stephanie, the other Shawna.

■ Penal Code section 190.2, subdivision (a)(10) (hereafter section 190.2(a)(10)), defines the witness-killing special circumstance in relevant part as follows: "The victim was a witness to a crime who was intentionally killed for the purpose of preventing his or her testimony in any criminal proceeding, and the killing was not committed during the commission, or attempted commission of the crime to which he or she was a witness . . . ."

The elements of the witness-killing special circumstance have been stated thus: "(1) a victim who has witnessed a crime prior to, and separate from, the killing; (2) the killing was intentional; and (3) the purpose of the killing was to prevent the victim from testifying about the crime he or she had witnessed." (*People* v. *Garrison* (1989) 47 Cal.3d 746, 792 [254 Cal.Rptr. 257, 765 P.2d 419].)

■ " 'In reviewing the sufficiency of evidence [for a special circumstance], the question we ask is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the [allegation] beyond a reasonable doubt.' " ' " (*People* v. *Bonin* (1989) 47 Cal.3d 808, 850 [254 Cal.Rptr. 298, 765 P.2d 460], italics in original.)

■ Defendant claims the evidence cannot support an inference that the murder of either Stephanie or Shawna "was not committed during the commission" of the murder of Laura within the meaning of section 190.2(a)(10). We agree. In *People* v. *Silva* (1988) 45 Cal.3d 604, 631 [247 Cal.Rptr. 573, 754 P.2d 1070], we held that the crime witnessed cannot be deemed "prior to, and separate from," the killing of the witness when both are part of "one continuous transaction" or "the same continuous criminal transaction." Here, the crime witnessed and the killings of the witnesses were such. The evidence is univocal: the murder of Laura and that of Stephanie and Shawna were integral parts of a single continuous criminal transaction against the entire family. Accordingly, the witness-killing special-circumstance findings are invalid.

## IV. PENALTY ISSUES

Defendant raises several claims bearing on the question of penalty. As will appear, none is meritorious.

### A. *Denial of Defendant's Motion to Bar Admission of Photographs of the Victims in Death*

Prior to the commencement of the penalty phase, defendant moved *in limine* to bar admission of any and all photographs of the victims in death. (Some of the photographs had been taken at the crime scene, others during autopsy.) He argued that the photographs were not relevant under Evidence Code section 210 and, in any event, were excludable as unduly prejudicial under Evidence Code section 352. The former provision defines "relevant" as "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The latter declares that "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." At the guilt phase, the court had barred admission of some of the photographs as unduly prejudicial, having determined in substance that the items were substantially more prejudicial than probative on the question of guilt.

The People opposed the motion. They argued in substance that (1) the photographs were relevant to issues that were both material and disputed, viz., the narrow question of the circumstances of the crimes and, certainly, the broad question of the appropriateness of death; and (2) they were not unduly prejudicial.

After reviewing the photographs, the court effectively denied the motion. As pertinent here, it determined in substance as follows: the photographs were relevant to the circumstances of the crimes and the appropriateness of death; they were indeed gruesome; but it was not the case that all were unduly prejudicial. It further determined that certain of the photographs were not unduly prejudicial and, as such, were admissible; and that others were in fact unduly prejudicial and, as such, were excludable. Subsequently, on the People's motion and over defendant's objection, it received into evidence the photographs it had held admissible.

■■■ Defendant contends that the court's ruling allowing the admission of the photographs in question was erroneous. The appropriate standard of review is abuse of discretion. The ruling comprises determinations as to relevance and undue prejudice. The former is reviewed under that standard. (See *People* v. *Green* (1980) 27 Cal.3d 1, 19-20 [164 Cal.Rptr. 1, 609 P.2d 468] [speaking generally].) So is the latter. (See, e.g., *People* v. *Pierce* (1979) 24 Cal.3d 199, 211 [155 Cal.Rptr. 657, 595 P.2d 91] [speaking specifically of photographs].)

Having considered the matter closely, we find no error. The court did not abuse its discretion when it determined that the photographs in question were relevant. Defendant's argument to the contrary is unpersuasive. The photographs were indeed probative—and highly probative—of issues that were both material and disputed, viz., the circumstances of the crimes and therefore the appropriateness of death. Nor did the court abuse its discretion when it determined that the photographs were not unduly prejudicial. Again, defendant's argument is unpersuasive. To be sure, the photographs were gruesome. But as stated, they were also highly probative. The court could have reasonably concluded that their prejudicial force did not substantially outweigh their probative value.[7]

---

[7]Defendant claims the court's ruling was error under the United States Constitution as well as the Evidence Code. He argues that the decision was violative of the Fifth, Eighth, and Fourteenth Amendments. We reject the point at the threshold. It is, of course, "the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal." (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d

B. *Denial of Defendant's Motion to Exclude Evidence of the Conduct Underlying His Prior Felony Convictions*

Prior to the commencement of the penalty phase, defendant moved *in limine* to exclude evidence of the conduct underlying his prior felony convictions. The ground was in substance that such evidence was not relevant, or at least not sufficiently relevant, to any issue material to penalty. As pertinent here, the argument was to the following effect: under penalty factor (c) of Penal Code section 190.3 (hereafter section 190.3), "The presence or absence of any prior felony conviction" was indeed material; but the evidence sought to be excluded had no tendency in reason—or at least, no sufficient tendency—to prove or disprove the existence of any such conviction. Defendant appears to have assumed that the People sought to prove only the fact of his prior felony convictions.

The People opposed the motion. They argued in substance as follows: contrary to defendant's assumption, they sought to prove not only the fact of his prior felony convictions, but also the underlying conduct; under penalty factor (b) of section 190.3, "The presence or absence of [other] criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence" was also material; the evidence sought to be excluded had a substantial tendency to prove the existence of such criminal activity.

The court denied the motion. It determined in substance that evidence of the conduct underlying defendant's prior felony convictions was indeed relevant to the material issue of the existence of other criminal activity involving the use or threat of force or violence. In pertinent part, it reasoned: "I think that if the prior conviction involves violent criminal activity, then the Court has no alternative but to allow into evidence the circumstances surrounding any prior felony conviction. I don't know. I'm simply ignorant on what the facts are going to show or what the circumstances are surrounding any of the prior felony convictions." Without significant objection by defendant, the People subsequently introduced, and the court received, specific evidence concerning the conduct underlying the prior felony convictions.

Defendant now contends that the court's ruling was error. He must be deemed to challenge the crucial resolution of the question of relevance. As noted, such determinations are reviewed for abuse of discretion. No abuse appears. The People may, of course, seek to prove both the fact of

1048].) At trial, defendant failed to make any objection whatever based on any federal constitutional provision.

prior felony convictions and any underlying criminal activity involving the use or threat of force or violence. (*People v. Karis* (1988) 46 Cal.3d 612, 640 [250 Cal.Rptr. 659, 758 P.2d 1189]; *People v. Melton* (1988) 44 Cal.3d 713, 764 [244 Cal.Rptr. 867, 750 P.2d 741]; see *People v. Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301].) Contrary to defendant's claim, the evidence sought to be excluded appears plainly, and highly, relevant to the material issue of the existence of such criminal activity. Defendant may be understood to argue that the People should have been allowed to prove only the *fact* of the criminal activity, and that they should have been permitted to use only the record of the prior felony convictions in making their proof. But in *People v. Karis, supra,* 46 Cal.3d at page 640, we effectively held that as a general matter, the People may prove any pertinent circumstance of the criminal activity, and may do so in any permissible way. Defendant does not persuade us that in this case the People should have been subjected to the restrictions he now urges.

Defendant also contends that the subsequent admission of the specific evidence concerning the conduct underlying his prior felony convictions was error in and of itself. The point lacks merit. The evidence was plainly, and highly, relevant to the material issue of the existence of other criminal activity involving the use or threat of force or violence.

Defendant claims that the ruling and subsequent admission of the specific evidence concerning the conduct underlying his prior felony convictions violated certain rights assertedly guaranteed criminal defendants by, inter alia, the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution—viz., due process of law (U.S. Const., Amends. V, XIV); equal protection of the laws (*id.*, Amend. XIV); freedom from an impermissible risk of arbitrary and capricious decisionmaking (*id.*, Amends. VIII, XIV); and reliable penalty determination (*ibid.*).

We reject the point on procedural grounds. Defendant failed to put forth a sufficient constitutional argument when he made his motion *in limine*. He also failed to make a sufficient constitutional objection when the People introduced the specific evidence. Accordingly, he may not raise the underlying claim here. (See *People v. Gordon, supra,* 50 Cal.3d at pp. 1251-1252 [dealing with absence of argument]; *People v. Rogers, supra,* 21 Cal.3d at p. 548 [dealing with absence of objection].)

We also reject the point on the merits. The United States Supreme Court "has often declared that states have the broadest possible range in deciding what negative aspects of the defendant's character and background are relevant to the sentencing determination." (*People v. Balderas* (1985) 41 Cal.3d 144, 204 [222 Cal.Rptr. 184, 711 P.2d 480].) Evidence of other

criminal activity involving the use or threat of force or violence falls squarely within that range. (*Id.* at p. 205, fn. 32.) We are not persuaded that the admission of such evidence—in this particular case or generally—affects, in any constitutionally significant way, the fairness of the proceedings, the treatment of "similarly situated" defendants, the risk of arbitrary and capricious decisionmaking, or the reliability of the outcome. (See *People* v. *Karis, supra,* 46 Cal.3d at pp. 639-641 [impliedly concluding as much as to risk and reliability]; *People* v. *Balderas, supra,* 41 Cal.3d at pp. 204-205 [impliedly concluding as much as to fairness, risk, and reliability].)

C. *Denial of Defendant's Motion to Exclude Evidence of Unadjudicated Criminal Activity or, in the Alternative, to Impanel a Separate Jury*

Prior to the commencement of the penalty phase, defendant moved *in limine* to exclude evidence of unadjudicated criminal activity or, in the alternative, to impanel a separate jury to consider such evidence. The motion was based expressly on the Fourteenth Amendment's guaranty of due process of law and impliedly on the Eighth Amendment's prohibition against cruel and unusual punishments. Defendant acknowledged that *People* v. *Balderas, supra,* 41 Cal.3d 144, was fatal to his request. ▮▮ The guaranty of the Fourteenth Amendment—*Balderas* expressly held—did not bar the introduction of "other crimes" evidence at the penalty phase either absolutely or even before the same jury that sat at the guilt phase; nor—the case impliedly held—did the prohibition of the Eighth Amendment. (41 Cal.3d at pp. 204-205.) In spite of *Balderas,* defendant proceeded with the matter because "this may come up some day . . . ." Thereupon, the court denied the motion on the authority of that case. At the penalty phase, the People introduced "other crimes" evidence involving the kidnapping of Karen Stange.

Defendant contends that the court erred. He concedes that *Balderas* is controlling. He requests, however, that we reconsider and overrule that decision. We have declined similar invitations in the past. (See *People* v. *Medina* (1990) 51 Cal.3d 870, 906-907 [274 Cal.Rptr. 849, 799 P.2d 1282], collecting cases.) We decline defendant's now.

D. *Granting of the People's Motion to Introduce Evidence in Rebuttal on the Nature of Life Imprisonment Without Possibility of Parole*

Outside the presence of the jury, defendant moved for an order allowing him to introduce, and play for the jury, certain evidence referred to in the facts, viz., the videotape of a brief segment of a television series called "Two

on the Town," which dealt with San Quentin Prison and the infliction of the penalty of death. He argued that the segment was admissible as "relevant to . . . sentence" under section 190.3: it provided information as to the nature of the ultimate sanction.

The People opposed the motion. They argued in substance that the segment on San Quentin Prison was inadmissible because the proper focus of the penalty phase was defendant and his crimes, and that the proffered evidence was not pertinent thereto.

After viewing the "San Quentin" segment, the court granted defendant's motion. It reasoned in relevant part as follows. "[T]he 'San Quentin' film . . . basically is simply kind of a news account of what [the] San Quentin death chamber is, the gas chamber, and how it has been used in the past, and how it is continually to be maintained under the assumption that some day in California it will be used again. [¶] And I've thought about that. Does that relate to quote, 'sentencing' unquote? Well, that is one of the sentences that—one of the penalties that could be imposed in this case. It seems that, therefore, it could be appropriate to allow the jury to see that tape so that they have clearly in mind the full and complete thrust of what a punishment of death decision could be. And so my ruling would be to allow them to see that tape."

Before the "San Quentin" segment was to be played, the People moved outside the presence of the jury for an order allowing them to introduce in rebuttal the testimony of Mike Madding as to the nature of the penalty of life imprisonment without possibility of parole. As noted in the facts, Madding was the Public Information Officer at San Quentin Prison at the time the "San Quentin" segment was produced, and was interviewed on camera during the piece. The People argued in substance that Madding's proffered testimony was admissible as "relevant . . . to sentence" under section 190.3: it would provide, inter alia, information as to the nature of the penalty of life imprisonment without possibility of parole. The prosecutor stated: "It's my intention to call [Madding] in rebuttal . . . , since counsel has convinced the Court that they should know exactly what their options are, to inform the jury on what life without possibility of parole means. In other words, what a person serving such a sentence can look forward to as far as his time in prison, what privileges are available, what liberties are not available. [¶] I think that in light of the Court's ruling on the gas chamber, I think that they should also have an informed choice to know exactly what that type of sentence means."

Defendant opposed the motion. Counsel argued in substance that the proffered testimony was inadmissible because it was speculative and in any event "[in]appropriate."

The prosecutor responded: "[Y]ou can't say there are two penalties, and we're only going to show them, the jury, what one of them is. [¶] I don't think they should be shown either one. I've made that clear. I've been overruled on that point. And I don't think it's fair for them to see one and not the other. They're going to know what the death penalty is. I think they should equally be informed what life without possibility of parole is."

The court declined to rule on the People's motion. It reasoned in pertinent part as follows. "First of all, the reason I am allowing this tape to be shown is because I think that it goes, pursuant to 190.3 of the Penal Code, to the area of sentencing. [¶] The suggestion made by the District Attorney is that he should be allowed to present to the jury the other side, that is, the alternate to the possibility of the death penalty. And that also he should be allowed the opportunity to call this person, I guess, who they interviewed on this, who was at that time, I think it was the Public Affairs Officer at San Quentin . . . . [¶] I'm not going to rule in a vacuum. I have no idea what this man would say. At the same time, I'm certainly not going to dismiss out of hand the District Attorney's request to present a rebuttal witness as it relates to the sentencing factors. [¶] So I suppose what we will end up doing is, if it in fact is still intended by the People to present such evidence, we'll have this person come in and probably outside the presence of the jury make an offer of proof as to what the testimony would be . . . . [¶] I understand the District Attorney's position, and it doesn't on its face seem totally unreasonable, but I certainly am not going to just give him carte blanche to come in and bring forward information that I don't think is appropriate. So I think it's premature. I'm not going to rule on that now."

Defendant proceeded to introduce into evidence, and play for the jury, the videotape of the "San Quentin" segment.

After the defense rested, the People made an offer of proof outside the presence of the jury. The prosecutor stated as relevant here: "[I]t is my intention to call [Madding] . . . since, as Counsel eloquently observed, that the jury should know what the two alternatives are. Now that they know one, and that is the gas chamber, that they should now be familiar with what the life prisoner without possibility of parole is subject to." Called to the stand by the People in support of the offer of proof, Madding was examined by the prosecutor concerning such matters as the living accommodations and privileges available to persons sentenced to life imprisonment without possibility of parole, and also the living accommodations and privileges that defendant might himself obtain if he were sentenced to that penalty. Madding was cross-examined on these issues by defense counsel.

The court effectively granted the People's motion. Its ruling was as follows. "The matter that is before me is the question of whether or not it's

appropriate for the District Attorney to ask questions of Mr. Madding as they relate to what would be the—I guess, the atmosphere or aspects of the sentence if the jury decided upon life imprisonment without the possibility of parole. [¶] . . . There are a couple of issues that are really before the Court. [¶] First of all, it seems to me that it is appropriate to allow the District Attorney to show the other side of the coin, as it were, since I have allowed the defense to present briefly the videotape that shows the gas chamber at San Quentin. And so I would allow at least some presentation of what it is that makes up life imprisonment without the possibility of parole, issue number one. [¶] Issue number two, I think it is inappropriate to allow the witness to speculate on various matters, and it's—very much of the testimony that was elicited outside the presence of the jury certainly was speculative in nature. So I guess we'll take it on a question-by-question basis, and if there's objections, I'll rule upon those accordingly."

Thereupon, after calling Madding to the stand in the presence of the jury, the People conducted direct examination on, inter alia, the living accommodations and privileges of persons sentenced to life imprisonment without possibility of parole. For his part, defendant conducted cross-examination on these issues. Madding's testimony was brief and neutral.

 Defendant now contends that the court erred by granting the People's motion for permission to introduce in rebuttal the testimony of Madding as to the nature of the penalty of life imprisonment without possibility of parole. He argues that the ruling was improper under, among other provisions, the cruel and unusual punishments and due process clauses of the Eighth and Fourteenth Amendments to the United States Constitution, and also under their counterparts in article I, sections 17 and 7 and 15, of the California Constitution.

The point must be rejected. Defendant himself raised the issue of the nature of the penalties available to the jury. He introduced evidence as to one. In response, the People introduced evidence as to the other. It may well be, as defendant now urges, that both were wrong. (See *People* v. *Thompson* (1988) 45 Cal.3d 86, 138-139 [246 Cal.Rptr. 245, 753 P.2d 37] [holding inadmissible evidence as to the nature of the two possible penalties].) Also, it may well be, in accordance with the adage on which defendant now relies, that "two wrongs do not make a right." But on this record, defendant must be held responsible for any error on the court's part and accordingly may not be heard to complain thereof. The basis of the challenged ruling was the broad construction of the phrase, "relevant to . . . sentence," in section 190.3. That basis was laid by defendant himself. In any event, as noted Madding's testimony was brief and neutral. Prejudice could not have arisen therefrom.

### E. *Consideration of Invalid Witness-killing Special Circumstances*

■ Defendant contends that the court committed reversible error by allowing the jury to consider the invalid witness-killing special-circumstance findings. For the reasons stated in part III, *ante,* we agree that error occurred. But we cannot agree that reversal is required. Certainly, the error here is not prejudicial per se, but rather is subject to harmless-error analysis. Whether it violates state law only or implicates the United States Constitution as well is immaterial. It is harmless under both the "reasonable possibility" test of *People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135], and the "reasonable doubt" test of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S.Ct. 824, 24 A.L.R.3d 1065]. "Although we presume that the jurors [followed their instructions and] considered the invalid special-circumstance findings independent of their underlying facts, we cannot conclude that they could reasonably have given them any significant independent weight." (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 151 [249 Cal.Rptr. 320, 756 P.2d 1348].)

### F. *Prosecutorial Misconduct*

Defendant contends that the prosecutor committed misconduct in the course of his opening and closing arguments in summation.

■ What is crucial to a claim of prosecutorial misconduct is not the good faith *vel non* of the prosecutor, but the potential injury to the defendant. (See *People* v. *Bolton* (1979) 23 Cal.3d 208, 213-214 [152 Cal.Rptr. 141, 589 P.2d 396].) When, as here, the claim focuses on comments made by the prosecutor before the jury, a court must determine at the threshold how the remarks would, or could, have been understood by a reasonable juror. (Cf. *People* v. *Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218] [holding that in deciding whether an instruction is erroneous, a court must determine how it would have been understood by a reasonable juror]. But cf. *Boyde* v. *California, supra,* 494 at p. 370 [108 L.Ed.2d at p. 329, 110 S.Ct. at p. 1198] [holding that in deciding whether an ambiguous instruction is erroneous for Eighth Amendment purposes, a court must determine whether there is a reasonable likelihood that the jury would have understood the instruction as the defendant claims].) If the remarks would have been taken by a juror to state or imply nothing harmful, they obviously cannot be deemed objectionable.

The first part of defendant's attack is made under the rubric, "Evidence Outside of the Record." The comments relevant here are as follows.

At one point in his opening argument, the prosecutor stated: "Now, I want to get to the reasons why I believe the death penalty is appropriate on

the evidence of this case. The first and most important . . . is this crime. *This crime is perhaps the most brutal, atrocious, heinous crime certainly that's been committed in San Luis Obispo County, probably in this County* [i.e., Santa Barbara], *and very likely in this State.*" (Italics added.)

Later in his opening argument, the prosecutor said: "No, they [i.e., the victims] can't come in front of you and ask you to give this man the death penalty. That's my job. That's what I have to do. *This crime is the most brutal crime that can be imagined. Quite frankly, if this crime doesn't deserve the death penalty, we shouldn't have one.*" (Italics added.)

Then, in his closing argument, the prosecutor stated: "The statement [of Detective Bolts] about the death penalty, he [i.e., Bolts] doesn't tell you anything about it. It could perhaps be the erroneous opinion that there is no death penalty in the State of California. Whatever it was, it certainly wasn't binding. *They've certainly sought the death penalty, as have I, because it's appropriate in this case.*" (Italics added.)

Defendant claims that through the italicized words the prosecutor improperly presented "evidence" outside the record concerning the relative "brutality," "atrociousness," and "heinousness" of the crimes in question, and also vouched for the appropriateness of the penalty of death on behalf of the government and himself personally.

We reject the point on procedural grounds. ██ It is, of course, the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion he made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. (E.g., *People* v. *Green, supra,* 27 Cal.3d at pp. 27-34.) In this case, defendant made no such assignment and request. It is true that the rule does not apply when the harm could not have been cured. (*Ibid.*) Such a situation, however, was not present here: any harm threatened was certainly curable.

Defendant argues the general rule should not be allowed to operate at the penalty phase of a capital case. In *People* v. *Miranda* (1987) 44 Cal.3d 57, 108, footnote 30 [241 Cal.Rptr. 594, 744 P.2d 1127], we disagreed. Defendant asserts that *Miranda* is unsound on this point: procedural rules, he seems to say, must yield when a man's life is at stake. He is not persuasive. (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1269.)

██ We also reject the point on the merits. To be sure, a prosecutor may not go beyond the evidence in his argument to the jury. (E.g., *People* v. *Ledesma* (1987) 43 Cal.3d 171, 238 [233 Cal.Rptr. 404, 729 P.2d 839], and

cases cited therein (conc. opn. of Mosk, J.).) To do so may suggest the existence of "facts" outside the record—a suggestion that is hard for a defendant to challenge and hence is unfair. The question here is close. But after review, we believe that a reasonable juror would not have understood the prosecutor's words as "evidence" outside the record concerning the relative "brutality," "atrociousness," and "heinousness" of defendant's crimes in comparison with other actual crimes not introduced at trial. Rather, such a juror would have heard the remarks as a comment on the nature of the offenses themselves—to the effect that they were of exceeding enormity. Comment of that sort is permitted if it is reasonably fair in light of the evidence. That is true not only of the crimes tried in the present proceeding. (See *People* v. *Hovey* (1988) 44 Cal.3d 543, 579 [244 Cal.Rptr. 121, 749 P.2d 776].) It is also true of other criminal activity involving the use or threat of force or violence. This is because the prosecutor may argue issues—such as these—that are material to penalty. (See *People* v. *Marshall* (1990) 50 Cal.3d 907, 929 [269 Cal.Rptr. 269, 790 P.2d 676].) The comment here, which pertained to the crimes tried in the present proceeding, was reasonably fair. But in view of the potential for unfairness noted above, similar remarks should be avoided in the future.

■ Next, a prosecutor may not, of course, vouch personally for the appropriateness of the verdict he or she urges. (See *People* v. *Kirkes* (1952) 39 Cal.2d 719, 723-724 [249 P.2d 1].) Nor, we believe, may the prosecutor do so on behalf of the government. Vouching may suggest the existence of "facts" outside the record. A reasonable juror, however, would not have so understood the prosecutor's comments here. Instead, a reasonable juror would have heard them to state what was obvious and altogether unobjectionable—i.e., that it was the People's position that defendant's crimes called for the ultimate sanction.[8]

■ The second part of defendant's attack is made under the rubric, "Victim Impact." In his opening argument, the prosecutor made the following comments relevant here.

"Let's look at his crimes. His prior crimes . . . . [T]he word 'molest' is somewhat of a soft word. Don't really know what happened . . . .

"I felt it was essential to let you see what those crimes really were. It's not enough to just tell you, and it broke my heart to have to bring those

---

[8]Defendant also claims that through the italicized words the prosecutor minimized the jury's role in determining punishment in violation of the Eighth Amendment principles enunciated in *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633]. Surely, a prosecutor may not seek to "minimize the jury's sense of responsibility for determining the appropriateness of death." (*Id*. at p. 341 [86 L.Ed.2d at p. 247].) But a reasonable juror could not possibly have understood the prosecutor's comments to carry a meaning objectionable under *Caldwell*. Defendant's argument to the contrary must be rejected out of hand.

victims in to tell you. Not not [*sic*] one of them was reluctant. Not one of them said, 'I can't do it. I don't want to do it.'

*"They all came in. They all testified. And it was heartbreaking. But it was important, because the only way you can really understand what a depraved individual this man is, is to look at the suffering that he has inflicted on others.*

" . . . . . . . . . . . . . . . . . . . . . . .

"There's another importance for bringing that in front of you. Throughout this whole thing, the defendant talks about molesting Shawna and Stephanie. The nice child molester. The nice Uncle Richard. How he didn't hurt them. How they liked it. How they were enthusiastic.

"No. That's the liar Richard Benson. They didn't like it. They liked it as much as those other girls liked it. They were three and four years old. They weren't any sophisticated sexual three or four year olds. They were just three and four year old little girls. That's where that comes in. It's another manifestation of his personality, of his lies, and of his cruelty.

*"You see, I can't prove to you by way of testimony the type of pain, the type of suffering those little girls went through. I can't do it. I can attempt to approximate it by showing you other little girls, what their experiences were, and how it scarred them for life."* (Italics added.)

Defendant claims that through the italicized words, the prosecutor violated the Eighth Amendment principles stated in *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529], and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207].

 In *Booth*, the United States Supreme Court concluded that it was generally violative of a criminal defendant's rights under the cruel and unusual punishments clause of the Eighth Amendment to introduce evidence concerning such matters as the victim's personal characteristics, the emotional impact of the crime on the victim's family, and the opinions of family members about the crime and the criminal: the information is irrelevant to the decision whether the defendant is to live or die, and its admission creates a constitutionally unacceptable risk that the decision maker may impose the ultimate sanction in an arbitrary or capricious manner. (482 U.S. at pp. 502-509 [96 L.Ed.2d at pp. 448-452].) In *Gathers*, the court followed *Booth* and concluded that it is generally violative of those same rights to present argument relating to such matters. (490 U.S. at pp. 810-811 [104 L.Ed.2d at pp. 882-883, 109 S.Ct. at pp. 2210-2211].)

In *People* v. *Marshall, supra,* 50 Cal.3d 907, 929, we held impliedly, but unmistakably, that *Booth* and *Gathers* do not extend to evidence or argument concerning the nature and circumstances of the capital offense or the effect of that offense on the victim. The reason is plain: that information is uniquely relevant to the life-or-death decision and, as such, does not create a constitutionally unacceptable risk of arbitrary or capricious sentencing. We hold today that *Booth* and *Gathers* do not extend to evidence or argument relating to the nature and circumstances of other criminal activity involving the use or threat of force or violence or the effect of such criminal activity on the victims: in our view, that information is highly relevant to the life-or-death decision.[9]

We cannot reject the point on procedural grounds. ▮ As stated, it is the general rule that a defendant—like defendant in this case—who did not make an assignment of misconduct and a request for admonition at trial cannot complain of the asserted impropriety on appeal. "The rule, however, does not apply when, as here, the authority supporting the complaint post-dates the conduct complained of." (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1266.)

▮ But we do, and must, reject the point on the merits. A reasonable juror would have understood the prosecutor's words as comments on the nature and circumstances of defendant's present crimes and his other criminal activity involving the use or threat of force or violence. In light of the evidence, those comments were reasonably fair. Such a juror would not have understood the prosecutor's remarks as crossing the constitutional barrier marked by *Booth* and *Gathers* into such forbidden areas as the victims' personal characteristics, the emotional impact of the crime on their families, and the opinions of family members about the crimes and the criminal.

▮ The third part of defendant's attack is made under the rubric, "Protection of Society." In his opening argument, the prosecutor made the following comments relevant here.

"Now, why is life without possibility of parole an insufficient punishment in this case? You may say, 'What good would it serve to give Mr. Benson the death penalty, and we can accomplish everything we want with life without possibility of parole?'

---

[9] We need not, and do not, decide whether *Booth* or *Gathers* applies to evidence or argument concerning such matters as the personal characteristics of a victim of other criminal activity involving the use or threat of force or violence, the emotional impact of such criminal activity on the victim's family, and the opinions of family members about the criminal activity and the criminal actor. (See *People* v. *Malone* (1988) 47 Cal.3d 1, 38 [252 Cal.Rptr. 525, 762 P.2d 1249] [assuming without deciding that *Booth* applies to argument of this kind].)

"Well, first of all, that would be a rather selfish view. That means we're thinking about ourselves. We're thinking about us on the outside, thinking about the protection of that society. We're not thinking about the victims in this case when we make that assessment. We're not saying that, 'Look what he did. Let's just put him away. We don't have to think about him anymore.' That's not sufficient punishment for what he did. That's not sufficient punishment for his crimes.

"Would he still be dangerous? Would he still offend in the future? Certainly. He has that propensity . . . .

". . . *We know if* [] *given the opportunity, he will not only molest children again, he will murder again. That is not a 100 percent protection of society, and it's a selfish view of ourselves to say that that's the solution to this crime.*" (Italics added.)

Defendant claims that through the italicized words, the prosecutor presented an "argument" that "was grossly improper. Like the Briggs Instruction held improper in *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430], it urged a death verdict based on impermissible speculation that [defendant], if sentenced to life without the possibility of parole, would nonetheless be released in the future to molest children and kill again."

Again, there was no assignment of misconduct or request for admonition.

Again, there is no merit in the point. A reasonable juror would not have understood the prosecutor's comment as defendant asserts. Rather, he would have heard it as a claim that defendant would be dangerous in prison if his life was spared.

Defendant may be understood to argue that such a comment was improper under *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782]: it referred to the issue of future dangerousness; the circumstances material to the determination of penalty are those defined in section 190.3; those circumstances, however, do not include future dangerousness. But the circumstances material to penalty include anything that the defendant proffers as a basis for a sentence less than death. (38 Cal.3d at pp. 775-776.) To support a verdict of life imprisonment without possibility of parole, defendant elicited testimony from his experts suggesting he would not be dangerous in prison. On cross-examination, the prosecutor elicited testimony suggesting the opposite. "The prosecutor's cross-examination was proper: he could seek to disprove what defendant had sought to prove. [Citation.] Also proper therefore was the remark under challenge here: it was

squarely based on the evidence." (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1270.)

G. *Claims of Error in the Instructions on the Determination of Penalty*

Defendant contends that the court committed several errors by instructing the jury as it did on the determination of penalty. It is, of course, virtually axiomatic that a trial court must correctly instruct on such legal principles as are applicable to the evidence (e.g., *People* v. *Anderson* (1966) 64 Cal.2d 633, 641 [51 Cal.Rptr. 238, 414 P.2d 366])—and on such legal principles alone. The failure or refusal to do so constitutes error. Defendant claims that in a number of particulars, the court failed or refused to instruct as required. We shall consider his points seriatim.

1. *Instructions on the Determination of Penalty*

The court instructed the jury on the determination of penalty, in relevant part, as follows.

"In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case. You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance(s) found to be true.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

"(f) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime [and any sympathetic or other aspect of the defendant's character or record that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.

"You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle].

"(g) You may further take into consideration the information provided by family members, teachers, neighbors and friends of the defendant in determining whether the defendant has any redeeming qualities, and any events in his life that reveal those qualities.

". . . . . . . . . . . . . . . . . .

"Mitigating circumstances are any circumstances that do not constitute a justification or excuse of the offenses in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability.

"Aggravating circumstances are any circumstances are any circumstances [sic] attending the commission of the offenses in question which increase their guilt or enormity or adds [sic] to their injurious consequences, but which are above and beyond the essential elements of the offenses themselves.

". . . . . . . . . . . . . . . . . .

"The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating evidence (circumstances) (are) so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (Parentheses and brackets in original.)

### 2. *Claim of Error as to Aggravating Circumstances and Mitigating Circumstances*

It is settled that the cruel and unusual punishments clause of the Eighth Amendment prohibits the states from imposing a penalty that is disproportionate to a criminal defendant's personal culpability. (See, e.g., *People* v. *Marshall, supra,* 50 Cal.3d at p. 938.) It also bars use of procedures that create a constitutionally unacceptable risk of such disproportionality. (See, e.g., *Booth* v. *Maryland, supra,* 482 U.S. at pp. 502-509 [96 L.Ed.2d at pp. 448-452].)

Similarly, it is settled that the due process clause of the Fourteenth Amendment prohibits the states from "attach[ing] the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, . . . or to conduct that actually should militate in favor of a lesser penalty . . . ." (*Zant* v. *Stephens* (1983) 462 U.S. 862, 885 [77 L.Ed.2d 235, 255, 103 S.Ct. 2733].) Evidently, it also bars use of decision-making processes that may be understood to incorporate such "mislabeling" and thereby threaten arbitrary and capricious results.

Defendant contends that the court erred by instructing the jury as it did on aggravating circumstances and mitigating circumstances. His attack is directed against the court's failure to identify which circumstances were "aggravating" and which "mitigating," and its failure to state that the absence of mitigation did not amount to the presence of aggravation.[10] He claims that in this regard the charge was inconsistent with the federal constitutional principles stated above.

What is crucial for present purposes is the meaning that the instructions *communicated to the jury.* If that meaning was not objectionable, the instructions cannot be deemed erroneous. (See *People* v. *Warren, supra,* 45 Cal.3d at p. 487.) It now appears that we are to determine the meaning of the instructions *not* under the strict "reasonable juror" test—i.e., could a reasonable juror have understood the charge as the defendant asserts (*Mills* v. *Maryland* (1988) 486 U.S. 367, 375-376 [100 L.Ed.2d 384, 394-395, 108 S.Ct. 1860])—but rather under the more tolerant "reasonable likelihood" test—i.e., is there a reasonable likelihood that the jury so understood the charge (*Boyde* v. *California, supra,* 494 U.S. at p. 370 [108 L.Ed.2d at p. 329, 110 S.Ct. at p. 1198]). This is certainly true for purposes of the cruel and unusual punishments clause of the Eighth Amendment. (*Ibid.*) It ap-

---

[10] Defendant implies that he had requested the court to give an instruction to the effect that the absence of mitigation did not amount to the presence of aggravation. He fails to cite to the record. Our review discloses no such request.

pears to be true as well for purposes of the due process clause of the Fourteenth Amendment.

We must reject defendant's claim of error. Even under the strict "reasonable juror" test, the meaning that the instructions communicated was not objectionable.

To begin with, a reasonable juror would have understood the instructions as prohibiting him from imposing a penalty that was disproportionate to defendant's personal culpability. This conclusion is virtually compelled by the plain language used in the definitions of "aggravating circumstances" and "mitigating circumstances," and in the description of the "weighing" process. Contrary to defendant's assertion, such a juror could not have interpreted the charge other than as barring disproportionality.

Further, a reasonable juror could not have "attached the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, . . . or to conduct that actually should militate in favor of a lesser penalty . . . ." (*Zant* v. *Stephens, supra,* 462 U.S. at p. 885 [77 L.Ed.2d at p. 255].)

Defendant's claim to the contrary notwithstanding, a reasonable juror would readily have identified which circumstances were "aggravating" and which "mitigating." Again, this conclusion is virtually compelled by the plain language used in the definitions of "aggravating circumstances" and "mitigating circumstances," and in the description of the "weighing" process. Certainly, such a juror could not have inferred—contrary to governing law (see *People* v. *Davenport* (1985) 41 Cal.3d 247, 288-289 [221 Cal.Rptr. 794, 710 P.2d 861] (plur. opn.))—that extreme mental or emotional disturbance and diminished capacity were circumstances in aggravation. Defendant argues in substance that a reasonable juror might have understood these circumstances as indicia of future dangerousness and hence as grounds for the ultimate sanction. We are not persuaded. It is pellucid in the very words of the instructions that both circumstances looked to the past, not the future, and supported life, not death.

Again notwithstanding defendant's claim, a reasonable juror could not have believed—contrary to governing law (see *People* v. *Davenport, supra,* 41 Cal.3d at pp. 288-289 (plur. opn.))—that the absence of mitigation amounted to the presence of aggravation. The instructions made plain that aggravation required the *existence* of "circumstances attending the commission of the offenses in question which increase their guilt or enormity or adds [*sic*] to their injurious consequences, but which are above and beyond the essential elements of the offenses themselves"—and not merely the

*nonexistence* of "circumstances . . . which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability."[11]

### 3. *Claim of Error on Refusal to Delete "Extreme" From "Extreme Mental or Emotional Disturbance"*

Defendant requested the court to delete the adjective "extreme" from the penalty factor concerning "Whether or not the offense was committed while the defendant was under the influence of *extreme* mental or emotional disturbance." (Italics added.) The court refused.

Defendant contends that the court erred. He argues in substance that the instruction as given, without the deletion requested, amounted to an incorrect statement of the law: (1) under both the Eighth and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, and 17, of the California Constitution, " ' "the sentencer . . . [may] not be precluded from considering, *as a mitigating factor*, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death[]" ' " (*Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6, 106 S.Ct. 1669], quoting *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869], quoting in turn *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 8 S.Ct. 2954], italics in original (plur. opn. by Burger, C. J.) [construing federal constitutional provisions]); (2) defendant proffered mental or emotional disturbance, nonextreme as well as extreme, as a basis for life imprisonment without possibility of parole; and (3) contrary to the constitutional principle stated above, the challenged instruction implied that the jury could not consider mental or emotional disturbance less than extreme in mitigation of penalty.

The point must be rejected. To be sure, the major premise of his argument is sound. But a crucial minor premise is not: the instruction as given, without the deletion requested, did not carry the preclusive implication defendant claims it did.

Again, what is crucial for present purposes is the meaning that the instruction *communicated to the jury*. As noted in part IV.G.2, *ante*, insofar as the claim rests on the United States Constitution, the standard for determining the instruction's meaning is the "reasonable likelihood" test of *Boyde* v. *California, supra*, 494 U.S. 370 [108 L.Ed.2d 316, 110 S.Ct. 1190].

---

[11] Defendant claims that the instructions were also inconsistent with the due process clauses of article I, sections 7 and 15, of the California Constitution. He predicates his point on the assertion that the charge "inject[ed] irrelevant factors into the jury's decision-making process . . . ." The assertion, however, is unsupported. Therefore, the claim must fail.

Insofar as it rests on the California Constitution, our recent cases compel the conclusion that the same standard is applicable.

The jury was expressly told that they could take into account "Any . . . circumstance"—in addition to those specified—"which extenuates the gravity of the crime even though it is not a legal excuse for the crime [and any sympathetic or other aspect of the defendant's character or record that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (Brackets in original.) Defendant's argument to the contrary notwithstanding, there is no reasonable likelihood that the jury would have inferred from the foregoing that they could not consider mental or emotional disturbance *of any degree whatever* in mitigation of penalty. (Compare *People* v. *Medina, supra,* 51 Cal.3d at pp. 901-902 [rejecting a claim similar to defendant's].)

4. *Claim of Error on Refusal to Instruct on Certain Specific "Mitigating Circumstances"*

Defendant requested the court to instruct the jury as follows.

"You may consider as further mitigating factors, the following facts or circumstances:

"(a) Richard Benson had a deprived and chaotic childhood during which he received little or no religious or moral training.

"(b) Richard Benson, in his formative years, was warehoused in group homes and institutions where he received little, if any, personal attention or affection.

"(c) In spite of the inadequacies of Richard Benson's family life, his personal bonds with his brothers and sister still remained.

"(d) Richard Benson, in his formative years, was subjected to mental abuse by his parents.

"(e) Richard Benson, in his formative years, was subjected to emotional abuse by his parents.

"(f) Richard Benson is an abuser o[f] drugs and is addicted to drugs.

"(g) That these murders were committed while Richard Benson was under the influence of mental or emotional disturbance.

"(h) That the capacity of Richard Benson to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired.

"(i) Richard Benson confessed in detail as to what he did and cooperated with the detectives of the District Attorney's Office and investigators of the San Luis Obispo Sheriff's Department as to his involvement.

"(j) That in his lengthy confession, Richard Benson repeatedly expressed remorse for his crimes.

"(k) Any other circumstance or circumstances arising form [sic] the evidence which you, the jury, deem to have mitigating value."

Subsequently, defendant withdrew his request as to factor (j), which dealt with remorse.

Determining that the instruction proposed was substantially argumentative, the court denied the request and refused to charge the jury accordingly.

Defendant contends that the court erred. We do not agree. ▆▆▆ "A court may—and, indeed, must—refuse an instruction that is argumentative, i.e., of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." (*People* v. *Gordon, supra*, 50 Cal.3d at p. 1276.) As noted, the court determined the instruction was in fact substantially argumentative. We need not resolve the question of the appropriate standard of review. Under any standard, the court's conclusion was plainly sound. (Compare *ibid.* [holding proper the refusal of a similar instruction on the same ground]; *People* v. *Williams* (1988) 45 Cal.3d 1268, 1323-1324 [248 Cal.Rptr. 834, 756 P.2d 221] [same].)[12]

Defendant claims the court did indeed err by refusing the requested instruction. He argues he was entitled to the instruction under *People* v.

[12] We recognize that in one of its parts, the instruction requested cannot be properly characterized as argumentative: it would have told the jury that they could consider certain specified penalty factors and also "Any other circumstance or circumstances arising form [sic] the evidence which you, the jury, deem to have mitigating value." But in that part, the instruction cannot be deemed to have been refused. As noted, the court instructed the jury that they could consider certain specified penalty factors and also "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime [and any sympathetic or other aspect of the defendant's character or record that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (Brackets in original.) But even if the instruction requested is deemed to have been refused, no error appears. The instruction was duplicative. It is not erroneous to refuse such a charge. (E.g., *People* v. *Farmer* (1989) 47 Cal.3d 888, 913 [254 Cal.Rptr. 508, 765 P.2d 940]; *People* v. *Wright* (1988) 45 Cal.3d 1126, 1134 [248 Cal.Rptr. 600, 755 P.2d 1049].)

*Sears* (1970) 2 Cal.3d 180, 189-190 [84 Cal.Rptr. 711, 465 P.2d 847]. He is wrong. "Under *Sears* [a criminal defendant] ha[s] a 'right to an instruction that "pinpoint[s] the *theory* of the defense." ' " (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1276, italics in original.) The instruction here did not do so. (Compare *ibid.* [holding proper the refusal of a similar instruction on the same ground]; *People* v. *Howard* (1988) 44 Cal.3d 375, 442 [243 Cal.Rptr. 842, 749 P.2d 279] [same].)

Defendant also argues he was entitled to the requested instruction under the cruel and unusual punishments clause of the Eighth Amendment as construed in *Lockett* v. *Ohio, supra,* 438 U.S. 586, and its progeny. Again he is wrong. "Under those cases [a criminal defendant] ha[s] a right to 'clear instructions which not only do not preclude consideration of mitigating factors, [citation], but which also "guid[e] and focu[s] the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender . . ." [citation].' " (*People* v. *Gordon, supra,* 50 Cal.3d at p. 1277.) Defendant received such instructions. "But under those cases [a criminal defendant does] not have a right to an instruction"—like the one here—"that invites the jury to draw favorable inferences from the evidence." (*Ibid.;* see *People* v. *Howard, supra,* 44 Cal.3d at pp. 442-443.)

Finally, defendant argues he was entitled to the requested instruction under the due process clause of the Fourteenth Amendment. He maintains: he had a "state created entitlement to such an instruction" under *Sears;* by refusing his request, the court arbitrarily denied him that "entitlement" and thereby violated due process. We are not persuaded. As explained above, he had no such "state created entitlement" under *Sears.* He also maintains the court assertedly gave a "pinpoint" instruction favorable to the prosecution; by refusing his request for a similar instruction favorable to the defense, it created an imbalance of forces between the accused and his accuser offensive to due process. Again, we are not persuaded. There was no imbalance attributable to "pinpoint" instructions: no such instructions were given. (Compare *People* v. *Gordon, supra,* 50 Cal.3d at p. 1277, fn. 15 [finding a similar argument unpersuasive].)

5. *Claim of Error on Refusal to Instruct the Jury Not to Consider Deterrence or Cost*

Defendant requested the court to instruct the jury that "In deciding whether death or life imprisonment without the possibility of parole is the appropriate sentence you may not consider for any reason whatsoever, the deterrent or non-deterrent effect of the death penalty or the monetary cost to the state of execution or maintaining a prisoner for life." The court refused.

 Defendant contends that the court erred. As implied in the introduction to part IV.G, *ante*, it is error for a court not to give an instruction if that instruction is both correct in law and applicable on the record; it is not error if either condition is lacking.

Defendant claims the requested instruction was correct. He is right. Certainly, under the Eighth and Fourteenth Amendments, "Questions of deterrence or cost in carrying out a capital sentence are for the Legislature, not for the jury considering a particular case." (*People* v. *Thompson, supra*, 45 Cal.3d at p. 132; see *Spaziano* v. *Florida* (1984) 468 U.S. 447, 461 [82 L.Ed.2d 340, 353, 104 S.Ct. 3154] [implying that the "deterrent function [of capital punishment] is primarily a consideration for the legislature"]; *Tucker* v. *Zant* (11th Cir. 1984) 724 F.2d 882, 890 [stating that "Protection of the public fisc is not a proper justification for capital punishment"].)

Defendant then claims the requested instruction was applicable. He is wrong. The issue of deterrence or cost was not raised at trial, either expressly or by implication. In *People* v. *Ramos, supra*, 37 Cal.3d 136, 159, footnote 12, we effectively held that the issue of commutation must be deemed raised at the penalty phase of all capital cases. Our evident assumption was that there was a significant possibility that some jurors might be aware of the possibility of commutation and proceed to take it into account in determining penalty. By contrast, we do not believe that the issue of deterrence or cost must be deemed raised at the penalty phase of all capital cases. Surely, we have no basis on which to make an assumption similar to that which we made in *Ramos*. Defendant may be understood to argue that such a basis does in fact exist. For support, however, he relies on little more than speculation and conjecture.[13]

6. *Claim of Error on Refusal to Instruct on the Burden of Proof Beyond a Reasonable Doubt as to Aggravating Circumstances*

 Defendant requested the court to instruct the jury to the following effect: (1) they could consider a circumstance in aggravation only if they were satisfied of its existence beyond a reasonable doubt; (2) they could fix the penalty at death only if they found that the aggravating circumstances outweighed the mitigating beyond a reasonable doubt; and (3) they could so

---

[13] We recognize that there is language in *People* v. *Thompson, supra*, 45 Cal.3d 86, 132, which might perhaps be read to support the proposition that it would be proper for a court to instruct the jury not to consider deterrence or cost *whenever the defendant so requests*: "it would not have been error to give this requested instruction to forestall consideration of deterrence or cost . . . ." The language, however, should not be read so broadly: its focus is solely the case under review. In any event, the words constitute dictum.

fix the penalty only if they determined that death was appropriate beyond a reasonable doubt. The court refused.

Defendant contends that the court erred. He claims that the requested instruction correctly stated the law. In support, he argues that imposition on the People of the burden of proof beyond a reasonable doubt as to each of the issues identified above is required by the 1978 death penalty law. He is altogether unpersuasive. He then argues that imposition of the burden is required by the Constitutions of the United States and California, specifically: (1) the cruel and unusual punishments clauses of the Eighth Amendment and article I, section 17; (2) the due process clauses of the Fourteenth Amendment and article I, sections 7 and 15; and (3) the equal protection clauses of the Fourteenth Amendment and article I, section 7. That is not the case. (E.g., *People* v. *Marshall, supra,* 50 Cal.3d at pp. 935-936.)

### 7. *Claim of Error on Refusal to Instruct on Mercy*

■ Defendant requested the court to instruct the jury that "In this part of the trial you may consider pity, sympathy, *or mercy* for the defendant in deciding on the appropriate penalty for him." (Italics added.) The court refused.

Defendant contends that the court erred. He claims that the requested instruction was legally correct: the law, he says, grants the jury authority to choose life over death simply because the former is desirable and the latter is not. We disagree. Neither statute nor Constitution gives the jury the right to exercise what is essentially godlike power.

Defendant argues to the contrary. He says that the 1978 death penalty law grants the jury authority to dispense mercy. We are not persuaded: there is no adequate support for the assertion. He then says that the Eighth Amendment grants such authority. Again we are not persuaded. To be sure, "Nothing in any of [the] cases [of the United States Supreme Court] suggests that the decision to afford an individual defendant mercy violates the Constitution." *(Gregg* v. *Georgia* (1976) 428 U.S. 153, 199 [49 L.Ed.2d 859, 889, 96 S.Ct. 2909] (lead opn. of Stewart, Powell, and Stevens, JJ.); accord, *McCleskey* v. *Kemp* (1987) 481 U.S. 279, 307 [95 L.Ed.2d 262, 288, 107 S.Ct. 1756].) But nothing in any of those cases suggests that such a decision is in fact authorized by the Constitution. At its root, the Eighth Amendment is simply prohibitory: it bars imposition of punishment that is unduly severe. (See, e.g., *People* v. *Marshall, supra,* 50 Cal.3d at p. 938.) It does not grant power, and hence does not authorize imposition of punishment that is unduly lenient. (Compare *People* v. *Andrews* (1989) 49 Cal.3d 200, 227-228

[260 Cal.Rptr. 583, 776 P.2d 285] [rejecting a similar claim of instructional error].)

### H. *Failure to Instruct on the Presumption of Innocence and the People's Burden as to Evidence of Unadjudicated Offenses*

In *People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279], we held that under the 1977 death penalty law (Stats. 1977, ch. 316, § 4 et seq., p. 1256 et seq.), a defendant " ' . . . during the penalty phase of a trial is entitled to an instruction to the effect that the jury may consider evidence of other crimes [in aggravation] only when the commission of such other crimes is proved beyond a reasonable doubt. [Citations.]' " (33 Cal.3d at p. 53 (plur. opn.); accord, *id.* at pp. 60-61 (conc. opn. of Broussard, J.).) In *People* v. *Miranda, supra,* 44 Cal.3d 57, 97-98, we impliedly, but clearly, held that a defendant was entitled to the same instruction under the 1978 death penalty law.

In conformity with the foregoing principle, the court instructed the jury: "Evidence has been introduced for the purpose of showing that the defendant [Richard Allen Benson] has committed the following criminal [act]: [kidnapping of Karen Stange] which involved [the express or implied use of force or violence] [or] [the threat of force or violence]. Before you may consider any such criminal [acts] as an aggravating circumstance [*sic*] in this case, you must first be satisfied beyond a reasonable doubt that the defendant [Richard Allen Benson] did in fact commit such criminal [act]. You may not consider any evidence of any other criminal [act] as an aggravating circumstance." (Brackets and bracketed material, except for "[*sic*]," in original.)

The court, however, did *not* instruct the jury to the effect that defendant was presumed innocent of the offense until the contrary was proved or that the People bore the burden of proof on the issue.

■ Defendant now contends that the court erred by failing to instruct the jury sua sponte on the presumption of innocence and the People's burden. He claims the omission was contrary to the 1978 death penalty law and also violated certain rights assertedly guaranteed criminal defendants under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution—viz., due process of law (U.S. Const., Amends. V, XIV) and a reliable penalty determination (*id.,* Amends. VIII, XIV).

The point must be rejected. We are not persuaded that the 1978 death penalty law requires an instruction that the defendant is presumed innocent of unadjudicated offenses offered in aggravation or that the People bear the

burden of proof on the issue: the "requirement" cannot be discerned either within the words of the statute or without. Nor are we persuaded that the United States Constitution requires the instruction in question. We have never held that the Constitution requires such an instruction—neither, to our knowledge, has any other appellate court in a reported decision. And we decline to so hold now. In *People* v. *Miranda, supra,* 44 Cal.3d 57, we concluded that the special rules governing the consideration of "other crimes" evidence in aggravation are "statutorily based" (*id.* at p. 99) and "not constitutionally mandated" (*id.* at p. 98). Defendant fails to show that our conclusion was unsound.

Of course, under California law the reasonable-doubt standard plays a vital role with regard to evidence of unadjudicated offenses offered in aggravation at the penalty phase of a capital trial. That standard provides whatever substance is possessed by the presumption of the defendant's innocence and the imposition on the People of the burden of proof. The jury was effectively instructed on the reasonable-doubt standard. No more was required here.

## I. *Failure to Instruct on Unanimity as to Evidence of Unadjudicated Offenses*

As noted in part IV.H, *ante,* the court instructed the jury that "Before you may consider" the evidence of the unadjudicated offense of kidnapping Karen Stange "as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant [Richard Allen Benson] did in fact commit such criminal [act]." (Brackets and bracketed material in original.) But it did *not* instruct them that their "satisfaction" must be unanimous.[14]

Defendant now contends that the court erred by failing to instruct the jury sua sponte on the "requirement" of unanimous agreement. He claims the omission was contrary to the 1978 death penalty law and also violated certain rights assertedly guaranteed criminal defendants under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution—viz., due process of law (U.S. Const., Amends. V, XIV) and a reliable penalty determination (*id.,* Amends. VIII, XIV).

The point must be rejected. In *People* v. *Miranda, supra,* 44 Cal.3d 57, we clearly, albeit impliedly, held that the 1978 death penalty law does not

---

[14] It is noted that defendant requested the court to instruct the jury as follows: "All twelve jurors must agree as to the existence of any aggravating factor before it may be considered by you. [¶] If the jury does not unanimously agree that the existence of an aggravating factor has been proven beyond a reasonable doubt, no juror may consider it in reaching their personal verdict." The court refused to do so.

require an instruction on unanimous agreement. (*Id.* at p. 99.) Further, we have never held that the United States Constitution requires such an instruction—neither, to our knowledge, has any other appellate court in a reported decision. And we decline to so hold now. As stated, in *Miranda* we concluded that the special rules governing the consideration of "other crimes" evidence in aggravation are "statutorily based" (*ibid.*) and "not constitutionally mandated" (*id.* at p. 98). Defendant fails to show that our conclusion was unsound. (Compare *People v. Gordon, supra,* 50 Cal.3d at p. 1273 [rejecting essentially the same constitutional claim].)

In *People v. Ghent* (1987) 43 Cal.3d 739, 774 [239 Cal.Rptr. 82, 739 P.2d 1250], we said with regard to the 1977 death penalty law: "[W]e see nothing improper in permitting each juror individually to decide whether uncharged criminal activity has been proved beyond a reasonable doubt and, if so, what weight that activity should be given in deciding the penalty." Here, we say the same with regard to the relevantly similar 1978 death penalty law.

## J. *Constitutional Validity of the Verdict of Death*

The jury returned the following verdict: "We, the Jury, find that the aggravating factors outweigh the mitigating factors and having considered the totality of the circumstances of the case, we fix the penalty at death." They provided no written statement in support.

■ Defendant contends that the verdict of death is invalid. He claims that the cruel and unusual punishments clause of the Eighth Amendment and the due process clause of the Fourteenth Amendment each require a supporting written statement. They do not. (E.g., *People v. Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113]; see, e.g., *People v. Gordon, supra,* 50 Cal.3d at p. 1278.) Contrary to defendant's assertion, there is no reason to revisit the question.

## K. *Denial of Defendant's Verdict-modification Application*

Defendant made an application for modification of the verdict of death under Penal Code section 190.4, subdivision (e) (hereafter section 190.4(e)). At the hearing on the motion, the court allowed relatives of the victims to make statements with respect to sentencing pursuant to Penal Code section 1191.1. Also, it noted that it had read and considered a presentence report, which contained similar statements. The victims' relatives asked for a sentence of death, and described such matters as the victims' personal characteristics, the emotional impact of the crimes on their family, and the opinions of family members about defendant and his crimes. The court proceeded to deny the application and to impose the ultimate sanction.

Defendant contends that the court erred. At the threshold he asserts that the court considered the statements of the victims' relatives, and the People assert the opposite. For purposes here, we shall assume that the court did in fact consider the statements in question.

Defendant first claims that the assumed consideration of the statements of the victims' relatives amounted to error of federal constitutional dimension under *Booth* v. *Maryland, supra,* 482 U.S. 496, and *South Carolina* v. *Gathers, supra,* 490 U.S. 805. We disagree. ▇▇▇ We acknowledge that read together, those decisions broadly hold that it is generally violative of a criminal defendant's rights under the cruel and unusual punishments clause of the Eighth Amendment to present information concerning such matters as the victim's personal characteristics, the emotional impact of the crime on his family, and the opinions of family members about the crime and the criminal—the very kind of information presented in the statements under review. But we have concluded that the broad holding of *Booth* and *Gathers* does not extend to proceedings relating to the application for modification of a verdict of death under section 190.4(e). (See *People* v. *Jennings* (1988) 46 Cal.3d 963, 994 [251 Cal.Rptr. 278, 760 P.2d 475].)[15]

▇▇▇ Defendant then claims that the assumed consideration of the statements of the victims' relatives amounted to error under state statutory law. Here we agree. "Under section 190.4(e), the court reviews the evidence presented to the jury" (*People* v. *Williams, supra,* 45 Cal.3d at p. 1329)— which does not include the statements in question (or, for that matter, the presentence report).

We turn now from the "error" to its consequences. The ruling must be set aside, the penalty judgment vacated, and the cause remanded for reconsideration of the verdict-modification application if and only if the "error" was prejudicial. (See, e.g., *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1201- 1202 [270 Cal.Rptr. 286, 791 P.2d 965].) The question of prejudice is apparently resolved under the so-called "reasonable possibility" test—i.e., is there a reasonable possibility that the error affected the decision? (See *id.* at p. 1202.)

Applying that test, we find no prejudice. In support of its ruling, the court provided an extensive statement of reasons. From that statement it is manifest that the court made its decision solely in light of the applicable law and the relevant evidence. We assume, as noted above, that the court con-

---

[15]Defendant also claims that the assumed consideration of the statements in question amounted to error of federal constitutional dimension under the due process clause of the Fourteenth Amendment. He argues that fundamental fairness was undermined. Having reviewed the record, we simply do not agree.

sidered the statements of the victims' relatives. And we concede that those statements were quite moving. But on this record—and especially in view of the reasons expressed—we cannot conclude that the court actually took those statements into account in making its decision. Indeed, it appears that the court viewed the statements of the victims' relatives in the nature of formal allocutions addressing the question of sentencing broadly, and not as evidence or argument bearing on the verdict-modification application itself. Moreover, we cannot conclude that the statements would have affected the outcome even if they had been taken into account. It was "the Court's personal assessment . . . that the factors in aggravation"—which plainly did *not* include the statements in question—"beyond all reasonable doubt far outweigh those matters in mitigation . . . ."

Accordingly, we are of the opinion that there is not a reasonable possibility that the "error" affected the ruling.

L. *Constitutionality of the 1978 Death Penalty Law: Treatment of Evidence of Unadjudicated Offenses*

Defendant contends in substance that the 1978 death penalty law is unconstitutional insofar as it allows individual jurors to consider evidence of unadjudicated offenses in aggravation without first requiring at least a substantial majority of a 12-member panel to agree that the People have proved such crimes beyond a reasonable doubt. Specifically, he claims that in this regard the law violates certain rights assertedly guaranteed criminal defendants under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution—viz., due process of law (U.S. Const., Amends. V, XIV), trial by impartial jury (*id.*, Amends. VI, XIV), and a reliable penalty determination (*id.*, Amends. VIII, XIV).

The point must be rejected. As stated in part IV.I, *ante*, in a quotation from *People* v. *Ghent, supra*, 43 Cal.3d at page 774, "we see nothing improper in permitting each juror individually to decide whether uncharged criminal activity has been proved beyond a reasonable doubt and, if so, what weight that activity should be given in deciding the penalty." We do not believe that in this regard the 1978 death penalty law implicates the guaranties of due process, jury trial, and reliable sentencing contained in the Fifth, Sixth, Eighth, and Fourteenth Amendments. In our view, the statutory scheme does not significantly affect, to the defendant's detriment, either the fairness of the penalty trial or the correctness of its outcome, nor does it

impair whatever federal constitutional right he might have to a determination by a jury.[16]

## V. Disposition

For the reasons stated above, we conclude that the witness-killing special-circumstance findings must be set aside but that otherwise the judgment must be affirmed.

It is so ordered.

Lucas, C. J., Broussard, J., Panelli, J., Eagleson, J., Kennard, J., and Arabian, J., concurred.

Appellant's petition for a rehearing was denied February 20, 1991.

---

[16] Having reviewed the record in its entirety, we conclude that the jury found that defendant actually killed, *and* intended to kill, the victims within the meaning of *Enmund* v. *Florida* (1982) 458 U.S. 782, 788-801 [73 L.Ed.2d 1140, 1145-1154, 102 S.Ct. 3368]. We also conclude that these findings are amply supported and adopt them as our own. Accordingly, we hold that imposition of the penalty of death on defendant does not violate the Eighth Amendment. (See *Cabana* v. *Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716, 106 S.Ct. 689].)