Filed 12/15/25  P. v. Morales CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GUSTAVO MATIAS MORALES,<br><br>    Defendant and Appellant. | H051640<br>(Monterey County<br>Super. Ct. No. 22CR00218) |

Late one night in February 2022, Officer Jorge David Alvarado stopped a car driven by Gustavo Matias Morales.  Morales exited the car, walked to the officer's car, and, before the officer could open his door, fired multiple gunshots through the driver's side window into the officer's head and neck, killing the officer.  As two bystanders witnessed the shooting, which also was captured in part by Officer Alvarado's body camera, and physical evidence tied Morales to the shooting, Morales did not dispute that he shot and killed Officer Alvarado.  Instead, Morales contended that he acted in self-defense out of fear of the police.  The jury was not persuaded and convicted Morales of first-degree murder and other crimes, and Morales was sentenced to life imprisonment without parole.

On appeal, Morales challenges his convictions on two grounds.  First, he argues that his trial counsel rendered ineffective assistance by not objecting to the admission of

statements made to an undercover informant that he shot Officer Alvarado in anger. Second, he argues that the trial court abused its discretion by admitting a formal police department photograph of Officer Alvarado in uniform. As explained below, we conclude that there was no ineffective assistance of counsel or abuse of discretion and uphold Morales' convictions.

Morales also argues that the abstract of judgment and the minute order for his sentencing both contain an error: They include a parole revocation fine that the trial court did not pronounce at the sentencing hearing. The People concede this error, and we accept that concession.

Accordingly, we affirm the judgment but direct the trial court to correct both the abstract of judgment and the sentencing minute order to omit the parole revocation fine.

# I. BACKGROUND

## A. The Shooting

On February 25, 2022, around 10:30 p.m., Officer Alvarado stopped Morales' car. Before Officer Alvarado could exit his car, Morales left his own car, walked to the officer's car, and fired multiple shots in rapid succession. Officer Alvarado's body camera shows that he was trying to open the door when shots were fired, shattering the glass, and afterwards Officer Alvarado fell out the open door. Morales drove off, and a bystander called 911.

When other police officers arrived, they found Officer Alvarado hanging out the driver's side door. As one arriving officer's body camera showed, Officer Alvarado's face was covered in blood, and he had a dozen gunshot wounds in the head, neck, shoulder, and upper body. Officers tried CPR, but Officer Alvarado did not respond. Soon thereafter, Officer Alvarado was taken to the hospital where he was pronounced dead.

Officers searching the scene found 13 nine-millimeter shell casings, and two .45-caliber casings, the latter of which appeared to be from the pistol issued to Officer Alvarado. Officers also found a single black slipper.

## B. The Arrest and Investigation

After evading a bystander who attempted to block him, Morales drove to his parents' house. When Morales arrived, he was barefoot, and one hand was bleeding. Morales' father drove him to the hospital, but Morales refused to enter, saying he feared the police. Morales later asked a friend to drive him to Mexico but eventually decided to go to another hospital, where police apprehended him.

When Morales' father returned home, he retrieved a gun from the front seat of Morales' car and hid it in a dresser. Police investigating the murder found the gun, and ballistics testing demonstrated that the gun had fired the nine-millimeter shells found at the shooting. In Morales' car, police also found a blood-stained slipper matching the one found at the shooting. DNA testing showed that blood at the scene of the crime and on the slipper in Morales' car were from Morales, as was DNA on one of the bullets found at the shooting.

## C. Morales' Statements to the Informant

After Morales was arrested, he was placed in a holding cell, and while Morales was there, the police put a confidential informant into the cell. As the informant entered the cell, an officer mentioned that he was "another southerner." After the officer left, the informant asked if Morales was a Sureño gang member, and Morales responded that he was a "paisa," that is, he was not affiliated with the Sureños or their rival, the Norteños.

After verifying that Morales was not a gang member, the informant said "nice to meet you," and Morales told the informant "I got one of those guys." Morales also said that he tried to go to Mexico but had lost a lot of blood and went to the hospital where he was arrested. After talking about the sentence that he supposedly faced, the informant

asked what prompted Morales to shoot the officer, and Morales replied that it "was just a reaction." Later Morales similarly said the shooting was "pure intuition" and "impulse." However, when the informant again asked Morales why he did it, Morales replied that he was "already angry" when the officer stopped him. Morales also said that he "had had a few beers," and the shooting "just happened."

### D. The Proceedings Below

#### 1. The Charges

In August 2022, Morales was charged with four crimes. The information charged Morales with the willful, deliberate, and premeditated murder of Officer Alvarado in violation of Penal Code section 187. (Subsequent undesignated statutory references are to the Penal Code.) The information also alleged enhancements for intentional discharge of a firearm resulting in death in violation of section 12022.53, subdivision (d) as well as murder in order to avoid arrest in violation of section 190.2, subdivision (a)(5) and murder of police officer in violation of section 190.2, subdivision (a)(7). The information also charged Morales with four additional crimes: (1) shooting at an occupied vehicle in violation of section 246, (2) assault on a police officer with a semiautomatic firearm in violation of section 245, subdivision (d)(2), (3) unlawful use of a firearm by a person convicted of domestic battery in violation of section 29805, and (4) unlawful carrying of a loaded firearm in a public street in violation of section 25850, subdivision (a).

#### 2. The Motions in Limine

Before trial, Morales filed a motion in limine seeking, among other things, to exclude photographs from Officer Alvarado's autopsy, pictures of Officer Alvarado from the crime scene, and video clips from the officer's body camera. Among other things, the autopsy photos showed Officer Alvarado with numerous steel probes through his head depicting the trajectory of the bullets that penetrated his skull, brain, facial bones, and spine as well as several other vital organs. Finding that the probative value of the

4

autopsy and crime scene photographs as well as the video clips outweighed their potential prejudice, the trial court denied the motion and held this evidence admissible.

In addition to moving in limine to admit autopsy and crime scene photographs, the prosecutor moved in limine to admit a police department photograph showing Officer Alvarado in uniform standing before flagpoles with the United States and California flags. Morales objected on the ground that identification was "not an issue" because "[i]t's going to be very clear who the decedent and the victim is in the case," and he argued that therefore photograph would be more prejudicial than probative. The trial court disagreed. It ruled that the photograph was relevant to establishing the ability of witnesses to identify Officer Alvarado, to show malice (by comparing the department photo with photos after the shooting), and to establish that he was a peace officer. The court also found that this probative value outweighed the potential for undue prejudice because the department photo did not portray Officer Alvarado with little children, at a church, or with his family and was not "particularly calculated to elicit sympathy." Instead, the court reasoned, the photograph merely showed the officer in his uniform.

### 3. *The Evidence Presented at Trial*

At trial, the prosecutor presented testimony from the two eyewitnesses who saw Morales shoot Officer Alvarado and the officer who arrived at the scene and found Officer Alvarado hanging out of the driver's side door. The prosecutor also showed video footage from Officer Alvarado's body camera showing the shooting, as well as evidence that the gun taken from Morales' car fired the nine-millimeter bullets that killed Officer Alvarado. Additionally, the prosecutor presented evidence that the blood-stained slipper found in Morales' car matched the slipper discovered at the scene of the crime and that Morales' DNA was on the slipper found in Morales' car, blood found at the scene of the shooting, and a .45-caliber bullet found there.

5

Morales testified in his defense. He admitted shooting Officer Alvarado. However, he claimed that he did so out of a belief that he needed to defend himself. Morales explained that in a prior encounter the police had beaten him, and he claimed that, once he was pulled over, "my body went into auto mode" and "everything just happened automatically."

On cross-examination, Morales admitted he had been convicted several times for lying to police officers. He also acknowledged that in this case he initially told officers that he blacked out and did not remember the shooting, but denied that this was a lie. Morales also denied that he was angry or frustrated when he shot Officer Alvarado. In response, the prosecutor introduced an excerpt of a transcript of Morales' statement to the undercover informant that he was angry when Officer Alvarado stopped him and shot the officer out of impulse. Morales said that he lied to the informant because he did not want the informant to be suspicious about his gang status. (Morales testified earlier that at one point he became a Sureño gang associate to protect himself, but later left the gang and was worried that he would be attacked if the informant learned that he was a drop-out.)

To impeach Morales' testimony about fearing the police, the prosecutor called Morales' cousin, Juanita Perez, who testified Morales had a violent temper when he was drinking. The prosecutor also presented testimony from Morales' former girlfriend that he was a violent drunk who repeatedly choked her and knocked her unconscious even while she was pregnant and again while breastfeeding their then three-month-old baby.

### 4. *The Verdict*

The jury found Morales guilty on all counts, including the first-degree murder of Officer Alvarado. The jury also found true all the alleged special circumstances, including that he had discharged a firearm causing great bodily injury or death, intentionally killed an on-duty peace officer, and committed murder to avoid arrest.

6

## 5. *The Sentence*

On the first count of first-degree murder, the trial court sentenced Morales to life in prison without the possibility of parole. The court also imposed a consecutive term of 25 years to life for the firearm discharge enhancement. On the remaining four counts, the trial court sentenced Morales to middle terms but stayed the sentences pursuant to section 654.

The trial court also imposed a fine and two assessments. Specifically, the court imposed a restitution fine of $10,000 under section 2102.4, subdivision (b)(2), $200 in court operations assessments under section 1465.18, subdivision (a)(1), and $150 in assessments under Government Code section 70373. The trial court did not impose a parole violation restitution fine, presumably because such fines are not authorized for sentences of life without parole. (*People v. McWhorter* (2009) 47 Cal.4th 318, 380.)

Morales filed a timely notice of appeal.

## II. DISCUSSION

### A. **Morales' Statements to the Undercover Informant**

On appeal, Morales does not dispute that he shot and killed Officer Alvarado. Instead, he contends that his defense that he acted out of fear of the police was undermined by the admission of his statements to the undercover informant, which his trial counsel should have tried to exclude on the ground that the statements were coerced and involuntary. We are not persuaded. Although the use of undercover informants is deceptive, it is well-settled that such ploys are not inherently coercive, and the informant here did not make any threats that coerced Morales into admitting that he was angry, not fearful, when he shot Officer Alvarado.

### 1. *Ineffective Assistance of Counsel*

We begin by discussing the standards governing claims of ineffective assistance of counsel.

7

The Sixth Amendment to the federal Constitution guarantees counsel for criminal defendants, and this guarantee is violated if an attorney makes professional errors so serious and damaging that the attorney is not truly functioning as counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) To prevail on such a claim of ineffective assistance of counsel, a criminal defendant must establish two things: (1) counsel's performance was deficient and (2) this deficient performance prejudiced the defense. (*Ibid.*; see also *id*. at p. 697 [ineffective assistance claims may be rejected for not satisfying either requirement].) In determining whether counsel's performance was deficient, courts examine whether counsel's conduct "fell below an objective standard of reasonableness" under prevailing professional norms. (*Id*. at p. 688.) Moreover, "there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925 (*Weaver*).) Under prevailing professional norms, defense counsel may refrain from raising meritless objections: "Counsel is not required to proffer futile objections." (*People v. Anderson* (2001) 25 Cal.4th 543, 587.)

A criminal defendant's burden with respect to ineffective assistance of counsel is " 'difficult to carry on direct appeal.' " (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Outside of these circumstances, ineffective assistance of counsel claims are "more appropriately resolved in a habeas corpus proceeding." (*Ibid.*)

### 2. *Analysis*

Morales contends that his trial counsel's performance was deficient because counsel failed to object to admission of his statements to the undercover informant posing

as his cellmate.  In particular, Morales contends that his trial counsel should have objected that these statements should have been excluded because they were coerced and involuntary.  As explained below, we disagree.

"An involuntary confession . . . is inadmissible under the due process clauses of both the Fourteenth Amendment [citation] and article I, sections 7 and 15" of the California Constitution.  (*People v. Benson* (1990) 52 Cal.3d 754, 778; see *People v. Boyette* (2002) 29 Cal.4th 381, 411.)  In determining whether confessions were involuntary, and thus inadmissible, courts examine " ' "whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne." ' "  (*People v. Massie* (1998) 19 Cal.4th 550, 576.)  For example, a confession is involuntary " ' "if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." ' "  (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.)  By contrast, "[p]olice trickery . . . does not, by itself, render a confession involuntary" because "subterfuge is not necessarily coercive."  (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280.)  Consequently, use of confidential informants is not inherently coercive, and confessions obtained by informants are considered voluntary unless the informant actually coerced the defendant into making the confession.  (See *Illinois v. Perkins* (1990) 496 U.S. 292, 296-300 (*Perkins*); but see *Arizona v. Fulminante* (1991) 499 U.S. 279, 285-288 (*Fulminante*) [holding confession involuntary based on threats by confidential informant].)

For example, in *Perkins*, *supra*, 496 U.S. 292, police placed an undercover officer in a cellblock with the defendant, and in purporting to plan an escape, the undercover officer interrogated the defendant about a murder, asking questions about the victim, the crime scene, the weapon used, and the defendant's motive.  (*Id*. at p. 295; *id*. at p. 305 (dis. opn. of Marshall, J.).)  The Supreme Court held that the defendant's answers to these questions "were voluntary, and there is no federal obstacle to their admissibility at trial."

9

(*Id*. at p. 300.)  The Supreme Court reasoned that "[w]hen a suspect considers himself in the company of cellmates," the atmosphere is not coercive (*id*. at p. 296), and in that situation there is no basis for assuming that "a suspect will feel compelled to speak by the fear of reprisal for remaining silent or in the hope of more lenient treatment should he confess" (*id*. at pp. 296-297; see also *id*. at p. 297 ["When the suspect has no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners."].).

The same is true here.  In this case, as in *Perkins*, an undercover agent was placed in a cell with the defendant, the defendant talked with the agent, and in so doing the defendant confessed to a murder.  Consequently, as in *Perkins*, there is no reason to assume that the defendant felt compelled to speak by fear of reprisals or in the hopes of obtaining more lenient treatment.  Indeed, the circumstances in this case are even less coercive than in *Perkins* because in that case the undercover agent was a police officer, and the officer interrogated the defendant about his crime.  Here, by contrast, the undercover agent was not a police officer, and the informant did not interrogate Morales.  To the contrary, before the informant even asked what Morales was charged with, Morales offered that he "got one of those guys."  Moreover, while the informant asked questions about the shooting—including why Morales shot the officer, the question that prompted Morales to say that he was angry—nothing in the questions was threatening or coercive.  Consequently, Morales' statements to the undercover informant in this case were at least as voluntary as the confession in *Perkins*, and defense counsel reasonably could have concluded that that it would have been futile to argue that Morales' confession was involuntary or coerced.

In contending that his statements were involuntary, Morales argues that he confessed to the informant because he is a gang drop-out and feared that he might be attacked if the informant, whom the police identified as a Sureño gang member, learned

10

about this.  In fact, Morales tried to protect himself from reprisals for being a gang drop-out by claiming that he was not affiliated with the Sureños or the Norteños, and the informant confirmed that he accepted that claim when he said "nice to meet you."  In addition, while Morales contends that he boasted about his violent actions to impress the informant, he does not explain why he chose to confess to the murder of Officer Alvarado in order to do so, much less why he said that he shot the officer out of anger.  In any event, as the dissent in *Perkins* recognized, the defendant in that case had a similar motive to demonstrate his toughness.  (*Perkins*, *supra*, 496 U.S. at p. 307 (dis. opn. of Marshall, J.) ["where the suspect is incarcerated, the constant  threat of physical danger peculiar to the prison environment may make him demonstrate his toughness to other inmates by recounting or inventing past violent acts."].)  As a consequence, neither Morales' concern about being a gang drop-out nor his desire to appear tough distinguishes this case from *Perkins*.

The Supreme Court's decision in *Arizona v. Fulminante*, *supra*, 499 U.S. 279 also does not help Morales.  *Fulminante* did not overrule *Perkins* or in any way suggest that the use of undercover agents is inherently coercive.  *Fulminante* merely recognized that, if an undercover agent threatens a defendant in order to obtain a confession, the confession may be coerced.  In *Fulminante*, the undercover agent was a former police officer masquerading as an organized crime figure.  (*Fulminante*, *supra*, 499 U.S. at p. 283.)  The informant learned that the defendant was suspected of a murder, and after other prisoners began to give the defendant " 'tough treatment,' " the informant offered to protect the defendant if he admitted to the suspected murder.  (*Ibid*.)  The Arizona Supreme Court held that the defendant's subsequent confession was involuntary because it was " 'obtained as a direct result of extreme coercion and was tendered in the belief that the defendant's life was in jeopardy if he did not confess.' "  (*Id*. at p. 286.)  In light

11

of these facts, the Supreme Court agreed that the defendant's confession was "the product of coercion." (*Id*. at p. 288.)

This case is clearly distinguishable. First, although Morales was a gang drop-out, he posed as a non-gang member, and he received no threats or "tough treatment." Second, the undercover informant did not offer to protect Morales or threaten to harm him. Finally, and most fundamentally, the informant did not demand that Morales confess to Officer Alvarado's murder. Instead, he simply asked questions about the shooting after Morales volunteered that he had shot the officer. Thus, none of the factors that led the Supreme Court to find coercion in *Fulminante* are present here, and therefore Morales' trial counsel had no reason to believe that his statements to the undercover agent were involuntary and inadmissible.

Accordingly, we conclude counsel did not render ineffective assistance by failing to object that Morales' statements to the undercover agent were coerced and involuntary.

## B. **The Officer's Department Photograph**

In addition to arguing that his trial counsel should have challenged the admission of his statements to the undercover informant, Morales challenges the admission of Officer Alvarado's official police department photograph. Morales argues the trial court abused its discretion in admitting this photograph because it was irrelevant and unduly prejudicial. We need not determine whether the photograph was properly admitted because, even if the trial court abused its discretion in doing so, any such error was harmless.

Where a party appeals a conviction based on the erroneous application of California law, such as the improper admission of evidence under Evidence Code section 352, the conviction will not be reversed unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *Weaver*, *supra*, 6 Cal.4th at

12

p. 934.)  Mere speculation that admission of evidence prejudiced the appealing party does not suffice.  *(Weaver*, at p. 968*.)*

The photograph of Officer Alvarado at issue here was not particularly inflammatory.  It is an official police department photograph showing the officer in his uniform standing in front of portions of the United States and California flags, apparently hanging from indoor (vertical) flagpoles.  In addition, the photograph was used only briefly at trial for the limited purposes of allowing two witnesses to identify the officer.  Combined, this testimony occupies only six lines of the trial transcript.

Other evidence presented at trial was much more likely to evoke sympathy for Officer Alvarado.  For example, the trial court admitted video clips from Officer Alvarado's body camera, which recorded the shots fired at him while he was in the car, the glass shattering, and the officer falling towards the pavement.  The court also admitted video clips of the responding officers, which showed Officer Alvarado on the pavement with his face covered in blood as officers attempted to revive him as well the autopsy photos, which showed Officer Alvarado's body with steel probes placed in his gunshot wounds to depict the trajectories of the bullets that struck him.  As the court observed, these photos were more likely to evoke sympathy for Officer Alvarado than the two brief displays of his official department photo.

In addition, the evidence of Morales' guilt was overwhelming.  Two eyewitnesses saw Morales shoot Office Alvarado.  The shooting was recorded on the officer's body camera, and the recording was shown to the jury.  In addition, there was physical evidence tying Morales to the scene, such as his DNA, which was found at the scene and on a bloody slipper that matched another slipper found at the scene, and ballistics testing showing that the gun that Morales' father took from Morales' car fired the 13 nine-millimeter bullets found at scene.  Furthermore, as discussed above, Morales admitted to an undercover informant, that he shot Officer Alvarado, and that he did so out

13

of "impulse" and because he was "already angry" at the officer when he was stopped. Morales also told the informant he had "a few beers" before the shooting, and two rebuttal witnesses testified that Morales was extremely violent when drunk.

In light of this testimony, and Morales' admissions that he had several convictions for lying, it is not reasonably probable that the jury would have accepted Morales' testimony that he shot Officer Alvardo out of fear for his life, if only the official photograph of Alvarado had not been displayed briefly to two witnesses. Accordingly, we conclude that, even if improper, admission of Officer Alvarado's official photograph was harmless.

Morales also argues that admission of Officer Alvarado's photograph violated his due process rights by leading the jury to infer that he was guilty through an emotional response rather than reason and that Morales' trial counsel rendered ineffective assistance of counsel by failing to raise a due process objection. However, as noted above, the emotional impact of the brief testimony concerning Officer Alvarado's photo was limited, particularly in contrast to the other much more evocative evidence admitted at trial. Consequently, admission of the photo was not "so prejudicial as to render the defendant's trial fundamentally unfair" (*People v. Falsetta* (1999) 21 Cal.4th 903, 913,) and therefore Morales' due process and related ineffective assistance claims fail.

## C. Cumulative Error

Morales argues that, even if there was insufficient prejudice from admission of his statements to the undercover informant and Officer Alvarado's official department photograph in isolation, his convictions should be reversed based on the cumulative prejudice suffered from the errors below. (See *In re Reno* (2012) 55 Cal.4th 428, 483, superseded by statute on other grounds as stated in *In re Friend* (2021) 11 Cal.5th 720, 728.) This argument fails because there was no error in the admission of the statements

14

to the undercover informant and no prejudice in the admission of Officer Alvarado's photograph.

### D. **The Abstract of Judgment**

Morales argues that, if his convictions are affirmed, the abstract of judgment and the minute order for the sentencing should be corrected. In particular, he contends that both the abstract and the order contain a $10,000 parole violation restitution fine that was not included in the oral pronouncement of sentence. The People concede that this fine was erroneously included, and we accept that concession.

After sentencing Morales to life imprisonment without parole plus a consecutive indefinite term of 25 years to life, the trial court imposed one fine and two assessments: a $10,000 restitution fine under section 1202.4, a $200 court operation assessment, and $150 court facility assessment. The trial court did not orally impose a parole revocation restitution fine. Nevertheless, the abstract of judgment includes a $10,000 parole revocation restitution fine under section 1202.45 in addition to the $10,000 restitution fine and the two assessments ordered by the trial court at sentencing. The sentencing minute order similarly includes a $10,000 parole revocation restitution fine.

Because "[r]endition of judgment is an oral pronouncement," the abstract of judgment and the sentencing minute order should have included only the fines and assessments orally pronounced by the trial court. (*People v. Mesa* (1975) 14 Cal.3d 466, 471, superseded by statute on other grounds as stated in *People v. Turner* (1998) 67 Cal.App.4th 1258, 1268; see also *People v. Delgado* (2008) 43 Cal. 4th 1059, 1070 ["[T]he abstract of judgment is not itself the judgment of conviction, and cannot prevail over the court's oral pronouncement of judgment to the extent the two conflict."], superseded by statute on other grounds as stated in *People v. Frahs* (2018) 27 Cal.App.5th 784, 795.) Accordingly, the abstract of judgment and the minute order

15

should be amended to strike the parole revocation restitution fine.  (*People v. Frederickson* (2020) 8 Cal.5th 963, 1027.)

## III.  DISPOSITION

The judgment is affirmed.  The trial court is directed to prepare an amended minute order and abstract of judgment removing the $10,000 parole violation restitution fine.  A certified copy of the amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.

_____

BROMBERG, J.

WE CONCUR:

_____

GREENWOOD, P. J.

_____

DANNER, J.

*People v. Morales*
H051640